ANTHONY "T.J." QUAN                    7903
THE QK GROUP LLLC
707 Richards St, PH-7
Honolulu, Hawaii 96813
Phone: (808) 358-7345
Email: tjquan@qkgrouplaw.com

GEOFFREY M. WYATT          [D.C. 498650]
(*Pro Hac Vice*)
NICOLE M. CLEMINSHAW  [D.C. 888314401]
(*Pro Hac Vice*)
ANDREW C. HANSON         [D.C. 888273742]
(*Pro Hac Vice*)
ZACHARY W. MARTIN         [D.C. 888304074]
(*Pro Hac Vice*)
1440 New York Avenue N.W.
Washington, D.C. 20005
Phone:  (202) 371-7000
Email: geoffrey.wyatt@probonolaw.com

NEIL C. WEARE                       [D.C. 997220]
(*Pro Hac Vice*)
Equally American Legal Defense
& Education Fund
1300 Pennsylvania Avenue, N.W.
Suite 190-413
Washington, D.C. 20004
Phone:  (202) 304-1202

VANESSA WILLIAMS                [Guam 1101]
(*Pro Hac Vice*)
Law Office of Vanessa Williams P.C.
414 West Soledad Avenue, GCIC Building,
Suite 500
Hagåtña, Guam 96910
Phone:  (671) 477-1389

PAMELA COLON        [U.S. Virgin Islands 801]
(*Pro Hac Vice*)

Law Offices of Pamela Lynn Colon, LLC
27 & 28 King Cross Street, First Floor
Christiansted, Saint Croix, Virgin Islands 00820
Phone:  (340) 719-7100

Attorneys for Plaintiffs
VICENTE TOPASNA BORJA,
EDMUND FREDERICK SCHROEDER, JR.,
RAVINDER SINGH NAGI,
PATRICIA ARROYO RODRIGUEZ,
LAURA CASTILLO NAGI, and
EQUALLY AMERICAN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| VICENTE TOPASNA BORJA, EDMUND FREDERICK SCHROEDER, JR., RAVINDER SINGH NAGI, PATRICIA ARROYO RODRIGUEZ, LAURA CASTILLO NAGI, and EQUALLY AMERICAN, | No. CV 20-00433 JAO-RT |
| Plaintiffs, | **THIRD AMENDED COMPLAINT** |
| v. | |
| SCOTT NAGO, in his official capacity as Chief Election Officer for the Hawaii Office of Elections, | |
| GLEN TAKAHASHI, in his official capacity as Clerk of the City and County of Honolulu, | |
| KATHY KAOHU, in her official capacity as Clerk of the County of Maui, | |

UNITED STATES OF AMERICA,

LLOYD J. AUSTIN III,
  in his official capacity as the Acting
  Secretary of Defense,

FEDERAL VOTING ASSISTANCE
  PROGRAM, and

DAVID BEIRNE,
  in his official capacity as Director of
  the Federal Voting Assistance
  Program,

                Defendants.

## THIRD AMENDED COMPLAINT

Plaintiffs Vicente Topasna Borja, Edmund Frederick Schroeder, Jr.,

Ravinder Singh Nagi, Patricia Arroyo Rodriguez, Laura Castillo Nagi

(collectively, the "Individual Plaintiffs") and Equally American Legal Defense and

Education Fund ("Equally American"), on personal knowledge as to their own acts

and upon information and belief reasonably formed after reasonable inquiry as to

the acts of others, hereby file this Complaint against Scott Nago in his official

capacity as Chief Election Officer for the Hawaii Office of Elections, Glen

Takahashi in his official capacity as Clerk of the City and County of Honolulu,

Hawaii, Kathy Kaohu in her official capacity as Clerk of the County of Maui,

Lloyd J. Austin III in his official capacity as the Secretary of Defense,[1] David

Beirne his official capacity as Director of the Federal Voting Assistance Program,

the Federal Voting Assistance Program, and the United States of America

("Defendants") and allege as follows:

## NATURE OF THE ACTION

1.     This action concerns the federal Uniformed and Overseas Citizens

Absentee Voting Act, Pub. L. No. 99-410, codified as amended at 52 U.S.C. §§

20301 to 20311 ("UOCAVA"), and the Hawaii statutes implementing its

requirements, known as the Uniform Military and Overseas Voters Act ("Hawaii

UMOVA") and codified at H.R.S. §§ 15D-1 to -18, and the related administrative

rules promulgated by the Hawaii Office of Elections, H.A.R. § 3-177-600.[2]

---

[1]     The First Amended Complaint named Mark Esper instead of Christopher C. Miller, as Secretary Esper was the Secretary of Defense at that time.  He was subsequently replaced by Christopher C. Miller as Acting Secretary.  The Second Amended Complaint named Christopher C. Miller, as Acting Secretary at that time.  Christopher C. Miller was subsequently replaced by Lloyd J. Austin III as the Secretary of Defense.  Pursuant to Federal Rule of Civil Procedure 25(d), Lloyd J. Austin III (in his official capacity as the Secretary of Defense) was automatically substituted as a defendant for former Acting Secretary of Defense Christopher C. Miller.  This Third Amended Complaint conforms to that substitution.

[2]     Hawaii's Chief Election Officer recently adopted new voting regulations, but in substance they continue to authorize persons eligible to vote absentee under UOCAVA to vote absentee in Hawaii.  *See* H.A.R. § 3-177-600(d)(4).  The prior regulation addressing the same issue was previously codified at H.A.R. § 3-174-22 and has now been repealed.

2.     Pursuant to these laws, former Hawaii residents are allowed to continue voting in Hawaii by absentee ballot for President and for voting representation in the U.S. Senate and U.S. House of Representatives if they reside in the Northern Mariana Islands ("NMI"), certain other insular territories, or in a foreign country, but not if they reside in Guam, the U.S. Virgin Islands, American Samoa, or Puerto Rico.

3.     This disparate treatment violates the U.S. Constitution's guarantee of equal protection.  Equal protection rights for residents of U.S. Territories are guaranteed by either the Equal Protection Clause of the Fourteenth Amendment or the equal-protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  *See Examining Bd. v. Flores de Otero*, 426 U.S. 572, 600 (1976); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 668 (1974).

4.     Disparate treatment with respect to voting is an especially grievous constitutional violation because voting is a fundamental right.  As the Supreme Court recognized in *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), nearly one hundred and thirty-five years ago, "the political franchise of voting" is a "fundamental political right, because [it is] preservative of all rights."  And more than fifty-six years ago, the Supreme Court stated that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most

3

basic, are illusory if the right to vote is undermined.  Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." *Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964).  Yet former residents of Hawaii who relocate to Guam, the U.S. Virgin Islands, American Samoa, or Puerto Rico are not afforded this right with respect to the federal election for President or voting members of Congress, even though they would be so enfranchised if they relocated to anywhere else in the world, including the NMI.

5.      As Congress itself recognized in enacting predecessor legislation to UOCAVA, "the right to vote for national officers is an inherent right and privilege of national citizenship," H.R. Rep. No. 94-649, pt. 1, at 5 (1975), reprinted in 1975 U.S.C.C.A.N. 2358, 2362; and "American citizens outside the United States . . . have their own Federal stake – their own U.S. legislative and administrative interests – which may be protected only through representation in Congress and in the executive branch," *id.* at 7, 1975 U.S.C.C.A.N. at 2364.  And as Rep. Al Swift described it at the time of UOCAVA's enactment, the law was intended to "protect a fundamental right" retained by American citizens, "*wherever* in the world they might be."  132 Cong. Rec. 20,976 (1986) (emphasis added).

6.      The federal and state laws at issue violate the fundamental guarantee of equal protection with respect to voting rights.  Congress selectively extended the franchise only to some disenfranchised U.S. citizens residing outside the States,

while denying it to others who are similarly situated.  Under UOCAVA, States are required to allow former state citizens residing outside the United States or in the NMI to vote on an absentee basis in federal elections.  But under the same law, States are free to deny that right to similarly situated persons residing in the other U.S. Territories overseas.

7.     The Constitution does not permit Congress and the States to pick and choose which voters living outside the States are able to maintain their right to vote for President and voting representation in the U.S. House and Senate.

8.     The discriminatory injury inflicted by these laws is aggravated by the fact that UOCAVA and Hawaii law single out a narrow group of former state residents for disfavored treatment:  those who move to Guam, the U.S. Virgin Islands, American Samoa, or Puerto Rico.  Since 1898, residents of America's overseas territories have been improperly relegated to a form of second-class citizenship based on the concern that these areas were populated by an "alien races" differing in "religion, customs, laws, methods of taxation, and modes of thought."  *Downes v. Bidwell*, 182 U.S. 244, 287 (1901).  The discriminatory application of voting rights under UOCAVA and Hawaii law is an extension of this injustice.

9.     The residents of the Territories comprise a discrete and insular minority that has been locked out of the political process by (among other things)

5

being denied the right to vote for President, Vice President and voting representation in Congress.  This political powerlessness has real implications for the lives of U.S. citizens living in the Territories.  As detailed below, these Territories have a proud tradition of military service yet cannot vote for their Commander-in-Chief; they pay many federal taxes yet have no voting representation in Congress regarding how their tax dollars are spent; and they are subject to the federal criminal code yet have no say in who decides who will serve as federal judges or federal prosecutors in their communities.

10.    Former state residents of Hawaii living in Guam, the U.S. Virgin Islands, American Samoa, and Puerto Rico are disenfranchised and relegated to a status as second-class citizens in ways they would not have been had they moved to anywhere else on Earth.  Indeed, even if they resided in Antarctica – or left Earth entirely to work at the International Space Station – they would still be permitted to vote for President and voting members of Congress in federal elections.  Moreover, Hawaii's laws permit U.S. citizens who have *never* resided in Hawaii to vote absentee under Hawaii UMOVA if a parent or guardian was last domiciled in the state of Hawaii, while denying absentee voting rights to former residents of Hawaii who have relocated to the Territories of Guam, the U.S. Virgin Islands, American Samoa, and Puerto Rico.  *See* H.R.S. § 15D-2; H.A.R. § 3-177-600.

11.     Neither Congress nor Hawaii has offered any explanation or justification for continuation of these arbitrary classifications.

12.     Plaintiffs are individuals who are injured by virtue of the Defendants' disparate treatment of former state residents residing in the Territories and overseas, along with Equally American.  The Individual Plaintiffs, who are former Hawaii residents, are not permitted to vote for President or voting representation in Congress by absentee ballot in Hawaii.  Equally American counts these former Hawaii residents among its members, and the inability of its members to vote for President or voting representation in Congress by absentee ballot in Hawaii diminishes their communities' access to the political process.

13.     Plaintiffs seek a declaratory judgment that UOCAVA and Hawaii UMOVA violate the equal protection guarantees of the Fifth and Fourteenth Amendments by extending absentee voting privileges to former Hawaii residents living foreign countries or NMI but not to former Hawaii residents living in Puerto Rico, Guam, the U.S. Virgin Islands, or American Samoa.  Plaintiffs seek a declaration and injunction requiring Defendants to enforce the provisions of UOCAVA and UMOVA with an even hand, extending absentee voting privileges to former Hawaii residents living in Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa on the same terms as to former Hawaii residents living in foreign countries and NMI.

14.     Plaintiffs' standing to seek such a declaration is firmly supported by Supreme Court precedent.  "[T]he [Supreme] Court has squarely held that a plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception that favors others."  *Barr v. Am. Ass'n of Pol. Consultants, Inc*, 140 S. Ct. 2335, 2349-50, 2355 (2020) (*AAPC*) (plurality).  Plaintiffs seeking equal treatment have standing because "when the right invoked is that to equal treatment, the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class."  *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017) (cleaned up).

15.     The Court also has the power to issue declaratory relief in such cases. Under a long line of Supreme Court precedent, this Court has the power "to implement what the legislature would have willed" to remedy a constitutional violation resulting in unequal treatment.  *Morales-Santana*, 137 S. Ct. at 1699 (quoting *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 427 (2010); citing multiple Supreme Court cases extending benefits).  If the challenged provision is unconstitutional, the court under takes a severability analysis, in which the central question is "Congress's hypothetical intent."  *AAPC*, 140 S. Ct. at 2350 (plurality). Through this analysis, courts try "to implement what the legislature would have willed had it been apprised of the constitutional infirmity."  *Morales-Santana*, 137

8

S. Ct. at 1699 (quoting *Levin*, 560 U.S. at 427); *see also id.* (The choice of how to remedy the unequal treatment "is governed by the legislature's intent, as revealed by the statute at hand."); *AAPC*, 140 S. Ct. at 2343, 2353-54 (plurality) (severing government-debt exception to the Telephone Consumer Protection Act's robocall restriction regime where "seven Members of the Court" "appl[ied] traditional severability principles" to conclude that the unconstitutional government-debt collection exception "must be invalidated and severed from the remainder of the statute").  Thus, the remedial choice here, turning centrally on hypothetical congressional intent, is whether to extend absentee voting to former Hawaii residents living in Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa, or whether to withdraw the entitlement to absentee voting from former Hawaii residents living in foreign countries and NMI.

16.    The correct remedy here is to extend absentee voting privileges to former Hawaii residents living in Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa.  Had Congress known that it could not constitutionally treat those individuals differently from former Hawaii residents living overseas, it would have chosen to retain the absentee voting benefit for Hawaii residents living in foreign countries and NMI and extend it to former Hawaii residents living in Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa.  Thus, the Court should sever the unconstitutional exclusion of former Hawaii residents living

in Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa and order the Defendants to treat them and former Hawaii residents living in foreign countries and NMI with an even hand.  The mechanics are as simple as striking and ordering unenforceable the inclusion of "the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa" from the definition of "United States" in 52 U.S.C. § 20310(8) and the inclusion of "Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States" from the definition of "United States" in H.R.S. § 15D-2, because these definitions are used to distinguish who lives "outside the United States" (and is therefore entitled to benefits) and who lives inside the United States (and who therefore, under the statutes, are not entitled to benefits).

17.     The question is not whether the Court has free-floating power to legislate benefits or order Congress or Hawaii to legislate benefits, but rather, after careful study of the statutory scheme, which course the Court concludes the legislatures would have taken if apprised of the constitutional infirmity.  And under longstanding Supreme Court precedent, the Court has the power to engage in "surgical severance" of the statute to avoid "wholesale destruction." *AAPC*, 140 S. Ct. at 2350-51 (plurality) (discussing cases).  That well-worn approach "allows courts to avoid judicial policymaking or *de facto* judicial legislation," because

Congress knows that the judiciary will avoid "unnecessarily disturbing a law apart from invalidating the provision that is unconstitutional." *Id.* at 2351.

18.     Plaintiffs also seek an injunction directing Defendants to refrain from (1) enforcing these provisions in a manner that violates the Fifth and Fourteenth Amendments or (2) enforcing Hawaii regulations in a manner that incorporates the Constitutional infirmity currently found in UOCAVA.  Courts have authority under the Declaratory Judgment Act to provide "[f]urther necessary or proper relief based on" declaratory relief, 28 U.S.C. § 2202; *Rincon Band of Mission Indians v. Harris*, 618 F.2d 569, 575 (9th Cir. 1980) (noting that 28 U.S.C. § 2202 authorizes district courts to grant injunctive relief to enforce declaratory judgments), as well as broad authority to "exercise [their] equitable powers to ensure compliance with the law" and to "mould [a] decree to the necessities of the particular case," *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680 (9th Cir. 2007) (citation omitted) (compelling federal agency to fund certain project).

## PARTIES

### A.     Plaintiffs

15.     a.     Plaintiff Vicente Topasna Borja is a U.S. citizen born in Guam in 1950.  He currently resides in Santa Rita, Guam.  In 1990, Mr. Borja was a resident of the City and County of Honolulu, Hawaii.  Defendants will not permit Mr. Borja to vote for President or for voting members of Congress by virtue of his

11

residence in Guam.  Under UOCAVA and Hawaii UMOVA, Mr. Borja would continue to be able to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Hawaii if he were a resident of the NMI or a foreign country.

       b.     Mr. Borja is a Vietnam-era Veteran who served 28 years in the U.S. Navy.  In 1969, while studying at the University of Guam, it became clear to Mr. Borja that based on his low draft number, he was likely to be drafted to serve in the U.S. Armed Forces – despite not being able to vote for his Commander-in-Chief.  Rather than wait to be drafted, Mr. Borja volunteered to serve in the U.S. Navy.  Over the course of his military service, Mr. Borja served multiple tours at sea throughout the world, often being away from his family for periods of 6 to 9 months at a time.

       c.     In 1990, while serving in Japan, Mr. Borja sought and received a humanitarian reassignment from Japan to Hawaii so that his wife could receive medical treatment not available in Japan for an aggressive form of cancer.  He established residency in Hawaii for what was supposed to be a two-year tour.  Unfortunately, his wife's cancer treatment was not successful, and his family was told that her cancer was terminal with no additional available medical treatment.  His wife's dying wish was that she could spend her remaining time in Guam with family and friends, so Mr. Borja sought and received another humanitarian

reassignment from Hawaii to Guam. A week after they returned to Guam, his wife

passed away. Mr. Borja's military service continued in Guam, where he raised his

two children with the support of his family. He received an honorable discharge in

1997 after a decorated military service career.

      d.    As a resident of Guam, Mr. Borja is unable to vote for

President, either on Guam or by absentee ballot in Hawaii, his former state of

residence. Mr. Borja actively participates in local Guam elections; this year he cast

his ballot on the first day of early voting. He would like to be able to vote for

President and have voting congressional representation in Guam. But until this is

possible, he desires to vote for President and voting Members of the U.S. House

and Senate by absentee ballot in Hawaii. Mr. Borja believes that if one can be

drafted to serve in the U.S. Armed Forces, as residents of Guam are, one should be

able to vote for the Commander-in-Chief.

      e.    Like many on Guam, Mr. Borja's naval career is one chapter of

his family's proud history of military and federal service. His father spent his

career in the federal civil service working at the Naval Supply Depot in Guam.

Two of his uncles served distinguished military careers. His son continues a

distinguished military service career as an officer, including multiple deployments

in Iraq and Afghanistan and current service at the Pentagon. Mr. Borja believes

that Guam's high rate of military service demonstrates the importance of extending

voting rights to the people of Guam, particularly for those who have served to defend democracy and the U.S. Constitution through military or federal service.

16.    a.    Plaintiff Edmund Frederick Schroeder, Jr. is a U.S. citizen born in North Carolina in 1945.  He currently resides in Mangilao, Guam.  From 1976 to 1984, Dr. Schroeder was a resident of the City and County of Honolulu, Hawaii. Defendants will not permit Dr. Schroeder to vote for President or for voting members of Congress by virtue of his residence in Guam.  Under UOCAVA and Hawaii UMOVA, Dr. Schroeder would continue to be able to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Hawaii if he were a resident of the NMI or a foreign country.

b.    Dr. Schroeder was drafted to serve in the U.S. Armed forces in 1968 just as he was beginning medical school at Case Western Reserve University in Cleveland, Ohio.  After completing medical school and residency, Dr. Schroeder was stationed in Hawaii in 1976, where he served at Schofield Barracks, providing primary care to military service members and their dependents.  Dr. Schroeder was honorably discharged in 1979.  He continued living and practicing medicine in Hawaii until 1984.

c.    In 1984, Dr. Schroeder and his family moved to Guam.  He has now practiced family medicine in Guam for over 35 years, providing care to thousands of island residents, including many of the most vulnerable.  Throughout

14

his career, he has seen firsthand the impact that disparities in federal healthcare spending have had on the provision of medical care on Guam, including the negative impact it has had on the island's response to COVID-19.  For example, it took months after the onset of COVID-19 for Guam to have access to even a minimum supply of testing.  And once tests were more widely available, capacity for analyzing the tests was limited, sometimes resulting in lengthy delays of up to 10 days or more.  More broadly, because of federal Medicaid caps, in many years Guam's Medicaid program has run out of funding part-way through the year, forcing practitioners and individuals to ration much-needed medical care.  Over Dr. Schroeder's career, federal caps on Medicaid have limited his practice's ability to take on additional Medicaid patients, and has at times limited care for those his practice is able to take on.  As a physician who conducts disability exams for the Social Security Administration, he has helped patients in the NMI receive Supplemental Security Income (SSI), even as his patients on Guam who suffer similar disabilities are denied SSI benefits.  Dr. Schroeder believes residents of Guam should enjoy the same federal healthcare benefits as the residents of the rest of the United States.  He believes that if residents of Guam had expanded voting rights and political representation in the federal government, they would be more likely to receive equitable treatment in federal healthcare programs.  This is one of

many reasons that Dr. Schroeder would like to be able to vote for President and voting representation in Congress.

d.      As a resident of Guam, Dr. Schroeder is unable to vote for President, either on Guam or by absentee ballot in Hawaii, his former state of residence.  Dr. Schroder has been an active voter throughout his life.  He would like to be able to vote for President and have voting congressional representation in Guam.  But until this is possible, he desires to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Hawaii.  Dr. Schroeder believes that all U.S. citizens should be able to vote for President and have voting representation in Congress, wherever they may live.

17.     a.      Plaintiff Ravinder Singh Nagi is a U.S. citizen born in Guam in 1976.  He currently resides in St. Thomas, U.S. Virgin Islands.  From 2002 to 2005, Mr. Nagi was a resident of the City and County of Honolulu, Hawaii. Defendants will not permit Mr. Nagi to vote for President or for voting members of Congress by virtue of his residence in the U.S. Virgin Islands.  Under UOCAVA and Hawaii UMOVA, Mr. Nagi would continue to be able to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Hawaii if he were a resident of the NMI or a foreign country.

b.      Mr. Nagi was born and raised in the U.S. Territory of Guam before he moved stateside to pursue his collegiate and legal education.  After

graduating from law school, he moved to Hawaii in 2002 to begin his legal career at the Hawaii Legal Aid Society.  In 2005, Mr. Nagi moved to St. Thomas in the U.S. Virgin Islands to join his parents, who had moved from Guam to the U.S. Virgin Islands several years earlier.  He now runs one of the top law firms in the U.S. Virgin Islands.

   c.   As a resident of the U.S. Virgin Islands, Mr. Nagi is unable to vote for President, either in the U.S. Virgin Islands or by absentee ballot in Hawaii, his former state of residence.  Mr. Nagi has been an active voter throughout his life, including voting for President in Hawaii.  He would like to be able to vote for President and have voting congressional representation in the U.S. Virgin Islands. But until this is possible, he desires to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Hawaii.

   d.   In 2008, Mr. Nagi participated in supporting the primary campaign of then Senator Barack Obama.  He attended a fundraiser in the U.S. Virgin Islands that Mr. Obama attended and was active in encouraging others in the U.S. Virgin Islands to vote for Mr. Obama in the primary election.  Mr. Nagi found it eye-opening that he could vote for President during the primary process, and even make contributions to support a presidential candidate, but was completely disenfranchised in the general election.  Now that his two sons are getting closer to voting age, Mr. Nagi has taught them the importance of voting

17

and political participation.  One of the primary reasons he is fighting to expand voting rights in U.S. territories is so that no child in the Territories is subject to the kind of disenfranchisement he has experienced in both Guam and the U.S. Virgin Islands.  Mr. Nagi is also confused as to why his right to vote for President as a U.S. citizen would be protected if he moved to a foreign country like the British Virgin Islands or a U.S. Territory like NMI, but was not protected in his move to the U.S. Virgin Islands.  The disparate treatment is particularly vexing to Mr. Nagi because had he moved from Hawaii to Tortola in the British Virgin Islands, just a short distance away from his current residence, Mr. Nagi would have been able to vote for President under both UOCAVA and Hawaii UMOVA.

18.   a.   Plaintiff Patricia Arroyo Rodriguez is a U.S. citizen born in Texas in 1959. She currently resides in Tumon, Guam.  From 1978 to 1994, Ms. Rodriguez was a resident of the City and County of Honolulu, Hawaii.  Defendants will not permit Ms. Rodriguez to vote for President or for voting members of Congress by virtue of her residence in Guam.  Under UOCAVA and Hawaii UMOVA, Ms. Rodriguez would continue to be able to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Hawaii if she were a resident of the NMI or a foreign country.

b.   For the past several decades, Ms. Rodriguez has been a popular radio and talk show host for the Sorensen Media Group.  As someone deeply

18

engaged in covering and discussing the news of the day, she has seen first-hand the impact that the denial of voting rights has had on Guam, whether it is negotiating with federal officials during the military buildup, addressing disparities in federal healthcare programs, seeking increased reimbursement for costs associated with regional migration under the Compacts of Free Association, or engaging the federal government to support decolonization and CHamoru self-determination. Ms. Rodriguez believes that expanded voting rights in Guam could have a positive impact on a range of policy issues given that Guam's greatest challenge in Washington, D.C., is often either a lack of knowledge or apathy on the part of federal officials whose decisions can have literal life-and-death consequences to island residents.  She believes that increased democratic accountability could lead to a more responsive federal government when it comes to issues important to the people of Guam.

c.      As a resident of Guam, Ms. Rodriguez is unable to vote for President, either on Guam or by absentee ballot in Hawaii, her former state of residence.  Ms. Rodriguez has been an active voter throughout her life, both in Hawaii and on Guam.  She would like to be able to vote for President and have voting congressional representation in Guam.  But until this is possible, she desires to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Hawaii.  Ms. Rodriguez believes that all U.S. citizens should be

able to vote for President and have voting representation in Congress, wherever they may live.

19.     a.     Plaintiff Laura Castillo Nagi is a U.S. citizen born in Illinois in 1975.  She currently resides in St. Thomas, U.S. Virgin Islands.  From 2002 to 2005, Ms. Nagi was a resident of the City and County of Honolulu, Hawaii. Defendants will not permit Ms. Nagi to vote for President or for voting members of Congress by virtue of her residence in the U.S. Virgin Islands.  Under UOCAVA and Hawaii UMOVA, Ms. Nagi would continue to be able to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Hawaii if she were a resident of the NMI or a foreign country.

b.     Ms. Nagi moved to Hawaii in 2002 to continue her legal career at the Legal Aid Society of Hawaii and then the Domestic Violence Clearinghouse (now known as the Domestic Violence Action Center).  In 2005, Ms. Nagi moved to St. Thomas.  She now has her own legal practice where she is active in family court, often serving as a court appointed guardian ad litem in abuse/neglect cases and representing minors in juvenile delinquency matters.  In addition to her legal practice, she is active in the community, providing education and training on mindfulness and emotional intelligence.  She also serves as Co-Chair of the Attorney Well-Being Committee of the Virgin Islands Bar Association.

c.    As a resident of the U.S. Virgin Islands, Ms. Nagi is unable to vote for President, either in the U.S. Virgin Islands or by absentee ballot in Hawaii, her former state of residence.  Ms. Nagi voted for President when she was a resident of Hawaii.  She would like to be able to vote for President and have voting congressional representation in the U.S. Virgin Islands.  But until this is possible, she desires to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Hawaii.

20.    a.    Equally American Legal Defense and Education Fund is a nonpartisan civil rights organization founded in 2013 that advocates for equality and voting rights for the nearly 4 million citizens living in U.S. Territories – 98% of whom are racial or ethnic minorities.  Its membership includes Individual Plaintiffs and other current residents of Guam, the U.S. Virgin Islands, Puerto Rico, American Samoa, and the Northern Mariana Islands who are former residents of Hawaii or other States.  One of its members is Dr. Thomas Shieh, a U.S. Navy veteran who was a resident of Hawaii prior to being stationed in Guam to serve as a physician at the U.S. Naval Hospital Guam.  A specialist in obstetrics and gynecology, Dr. Shieh has now lived in Guam for almost 25 years, delivering over 9,000 babies.  Another of its members, Renata Bordallo, became a resident of Hawaii while pursuing her master's degree in social work before returning home to Guam.  Ms. Bordallo's sister also established residency in Hawaii, but rather than

21

move home to Guam moved instead to the Northern Mariana Islands.  Because Ms.

Bordallo moved to Guam rather than to the Northern Mariana Islands, she cannot

vote for President or voting representation in Congress by absentee ballot in

Hawaii while her sister, who lives 135 miles to the north, is permitted to do so.  As

U.S. citizens, both Dr. Shieh and Ms. Bordallo would like to be able to vote for

President and have voting congressional representation in Guam.  But until this is

possible, they desire to vote for President by absentee ballot in Hawaii.  Both Dr.

Shieh and Ms. Bordallo would vote absentee for President in Hawaii if they were

permitted to.  In all, Equally American has several dozen other members living in

Guam, the U.S. Virgin Islands, Puerto Rico, and American Samoa who are former

residents of Hawaii, along with several hundred other members who are former

residents of other States, who have expressed a similar desire that if they are

unable to vote for President in the Territory where they live, they would like to be

able to vote absentee for President in their former State of residence.

   b.  Equally American's values are centered on the basic principle

that all U.S. citizens should have equal rights and representation, wherever they

live.  Equally American follows in the footsteps of earlier civil rights movements

to use the power of impact litigation and grass roots organizing to help drive

change for U.S. citizens who are disenfranchised from the political process.  Both

inside and outside the courtroom, Equally American works to raise the visibility of

these disenfranchised Americans at a national level.  Equally American does not take a position on the political status of U.S. Territories.

        c.     Equally American recognizes that the political empowerment of residents of Guam, the U.S. Virgin Islands, and other Territories is critical to addressing the interests and needs of these communities.  It believes that continuing political disenfranchisement contributes to many of the hardships facing these marginalized communities, from disparities in federal healthcare benefits to threats posed by natural disasters or foreign adversaries.  Equally American believes that expanding voting rights to residents of U.S. Territories who could vote for President if they lived in the NMI or a foreign country would provide new opportunities for national political engagement on issues that affect daily life in these neglected American communities.  Expanding voting rights in this way will also create a much-needed political incentive for Congress and the President to take action to ensure full voting rights for all U.S. citizens who live in the Territories.  Equally American's advocacy will not rest until every U.S. citizen is able to vote for President and has voting representation in Congress, whether they are a resident of a State or Territory.

     **B.**    **Defendants**

21.    Defendant Scott Nago is being sued in his official capacity as Chief Election Officer of the Hawaii Office of Elections.  By statute, the Chief Election

Officer "shall be the state official responsible for implementing" Hawaii UMOVA "and the State's responsibilities under" UOCAVA.  H.R.S. § 15D-4.

22.     Defendant Glen Takahashi is being sued in his official capacity as Clerk of the City and County of Honolulu, Hawaii.  By statute, county clerks in Hawaii, including the City Clerk for the City and County of Honolulu, have responsibility for voter registration and for determining eligibility for registration based on residency.  H.R.S. §§ 11-1, -11 & -13.

23.     Defendant Kathy Kaohu is being sued in her official capacity as Clerk of the County of Maui, Hawaii.

24.     Defendant United States of America enacted UOCAVA and exercises authority over the Territories where the Individual Plaintiffs reside.

25.     Defendant Lloyd J. Austin III is being sued in his official capacity as the Secretary of Defense.  Under Executive Order Number 12,642, 53 Fed. Reg. 21,975, at 21,975 (June 8, 1988), the Secretary of Defense is "designated as the 'Presidential designee'" under UOCAVA, 52 U.S.C. § 20301(a).

26.     Defendant Federal Voting Assistance Program ("FVAP") is charged with the administration of federal responsibilities under UOCAVA pursuant to a delegation of authority by the Secretary of Defense.  *See* Department of Defense Instruction 1000.04 (Sept. 13, 2012).

24

27.     Defendant David Beirne is being sued in his official capacity as Director of FVAP.  In that capacity, Director David Beirne is responsible for all aspects of FVAP and has the authority to administer that responsibility, including the establishment and maintenance of a voting assistance program "to assist all eligible voters as covered by" UOCAVA.  *See* Department of Defense Instruction 1000.04, at Encl. 3.

28.     Each of the above-named Defendants has been sued in its, his or her official capacity.  At all relevant times, Defendants have acted under the color of statutes, ordinances, regulations, customs and usages of the State of Hawaii or the United States.

## JURISDICTION AND VENUE

29.     This action seeks declaratory relief under the Federal Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-02.

30.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the Due Process and Equal Protection Clauses of the U.S. Constitution and under federal statute, 42 U.S.C. § 1983.  The Court also has subject matter jurisdiction under 28 U.S.C. § 1343(a)(3), because this is an action to "redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress

providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

31.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) & (e)(1) because the United States, David Beirne, the Federal Voting Assistance Program, and Christopher C. Miller, are federal defendants; Defendants Scott Nago, Glen Takahashi and Kathy Kaohu reside in this district; and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

32.     Plaintiffs have satisfied or will timely satisfy any requirements imposed on them by Federal Rule of Civil Procedure 5.1, which applies because this case challenges the constitutionality of federal and state statutes.  No notice or certification to the Attorney General of the United States is required because the United States is a party.  Fed. R. Civ. P. 5.1(a)(1)(A); 28 U.S.C. § 2403(a).  Notice to the Attorney General of Hawaii likely is also not required because the Chief Elections Officer is an officer or employee of the State of Hawaii, but notice is nevertheless being made as soon after the filing of this complaint as possible out of an abundance of caution.  Fed. R. Civ. P. 5.1(a)(1)(B); 28 U.S.C. § 2403(b).

## FACTUAL ALLEGATIONS

### A.     History Of Overseas U.S. Territories

33.     The United States has several Territories, including Puerto Rico, Guam, the U.S. Virgin Islands, American Samoa, and the NMI.  These

jurisdictions are home to nearly 4 million people, a population greater than almost half the States and larger than the five smallest States combined.  According to the U.S. Census, more than 98% of the residents of these areas are racial or ethnic minorities.

34.     Puerto Rico and Guam became a part of the United States in 1898 following the Spanish-American War.  American Samoa became part of the United States after Deeds of Cession were signed in 1900 and 1904.  The U.S. Virgin Islands was purchased by the United States from Denmark in 1917.  The NMI became part of the United States in 1986.

35.     Congress recognized people born in Puerto Rico were U.S. citizens in 1917, in the U.S. Virgin Islands in 1927, in Guam in 1950, and in the NMI in 1986. People born in American Samoa owe permanent allegiance to the United States; however, the federal government labels them as nationals, but not citizens, of the United States.

36.     Before it was admitted to the Union as a state in 1959, Hawaii was also subjected to a U.S. territorial status akin to that of the present-day Territories mentioned above.  The United States declared Hawaii a Territory by way of a joint resolution of Congress in 1898.  Two years later, Congress passed an Organic Act establishing Hawaii's territorial government.  Through this Organic Act, the Federal government maintained direct and absolute control over how Hawaii's

territorial government was organized and operated, thereby depriving Hawaii's indigenous native Hawaiian inhabitants and non-native inhabitants any meaningful opportunities to vote and participate in government.  The President, with the consent of the Senate, appointed the principal officers of the Territory – the Governor and Secretary.  The Governor appointed heads of the various territorial departments.  All territorial court judges (supreme court, circuit court, federal district court) were appointed by the President.  While the Organic Act set up a bicameral legislature with legislators that any citizen of Hawaii could vote for, Congress held the ultimate right to amend or invalidate any territorial law enacted by the Hawaii territorial legislature.  Further, Hawaii's Organic Act provided that residents of Hawaii would be represented in Congress only by a non-voting delegate.  Notably, however, the Supreme Court made clear in a ruling in 1927, well before Hawaii became a State, that the same "fundamental rights of the individual" that are protected in the States under the auspices of the Fourteenth Amendment "are guaranteed by the Fifth Amendment against" the "federal government and agencies set up by Congress for the government of the territory." *Farrington v. Tokushige*, 273 U.S. 284, 299 (1927) (extending the holdings of *Meyer v. Nebraska*, 262 U.S. 390 (1923) and related cases to the regulation of schools in Hawaii).

37.     While each area has a unique history and people, the Territories are similarly situated with respect to their relationship to the federal government. While each has a local government, ultimate authority rests with Congress, which has broad power over the Territories under Article IV, Section 3 of the U.S. Constitution.

38.     The Territories have a proud tradition of military service, with their residents serving in every major American conflict since World War I.  Territorial residents volunteer to serve in the U.S. Armed Forces at rates that are generally significantly higher than the 50 States.  According to the 2010 Census, over 100,000 veterans currently reside in the Territories.  Casualty rates Iraq and Afghanistan for service members from Guam and the U.S. Virgin Islands have been more than three times the national average.  Like other Americans, U.S. citizens who reside in the Territories are required to register for selective service when they turn eighteen.  These Americans are subject to the military draft the same as other Americans, with more than 50,000 territorial residents having served in Vietnam.

39.     Residents of the Territories also contribute a significant amount to the federal treasury through federal taxes.  In 2018 alone, residents of the Territories paid more than $3.5 billion in federal taxes according to the 2018 Internal Revenue Service Data Book.  Territorial residents pay most federal taxes, although only

certain federal employees pay federal income taxes.  Territorial residents also receive most federal benefits, although many major benefits like Medicaid have funding levels capped at levels well below what residents of the States receive.

40.     Federal criminal laws fully apply in the Territories.  In 2012, more than 2,100 individuals were prosecuted for federal crimes in the Territories, with more than 1,500 receiving a criminal sentence according to the Bureau of Justice Statistics Federal Justice Statistics Program.  Under federal criminal law, territorial residents may face life in prison or even the death penalty, even though none of the Territories provide for capital punishment, and several expressly prohibit it.  More broadly, because of the disenfranchisement of territorial residents in all the affected Territories, there is no democratic accountability with respect to the federal laws they must follow, or with the federal prosecutors and federal judges who enforce the law, preside over trials, and determine sentencing.

41.     While Congress has broad power over the Territories, each Territory's sole federal representation is a non-voting Delegate in the U.S. House of Representatives, who shares many of the privileges of other Members, but who cannot vote on final passage of legislation.  The Territories lack any form of representation, voting or not, in the U.S. Senate.  In presidential elections, territorial residents fully participate in the party primaries, with Delegates attending the national party conventions.  But when it comes to the General

Election, the Territories are not included in the Electoral College, as are residents of the States (and the District of Columbia based on the Twenty-Third Amendment).

42.     Voting in the Territories does not break down along any predictable party lines.  For example, Guam currently has a Democratic Governor, but for the preceding sixteen years Guam's Governor was a Republican.  Each Territory has elected both Democrats and Republicans to represent them in Congress.  Perhaps most striking, Guam includes a straw poll for President on its General Election ballot, with Guam voters – who cast their votes a day ahead of the rest of the country – supporting the eventual winner in every presidential election between 1984 and 2012.

43.     Residents of U.S. Territories are able to vote for President should they become a resident of a State or the District of Columbia.  Indeed, there is a territorial diaspora of more than 5 million Americans living in the States who have ties to the Territories, whether through family or having actually lived in a Territory.  Included among those in the diaspora who will have a particularly influential political voice in 2020 are the more than 750,000 U.S. citizens of voting age with ties to the Territories, who live in Florida, 340,000 in Pennsylvania, 75,000 in North Carolina, 70,000 in Georgia, 40,000 in Wisconsin, and 30,000 in Arizona and Michigan.  Each year, tens of thousands of territorial residents move

to the States.  Thousands of residents of the States also move to the Territories, where they become disenfranchised, depending on which Territory they move to.

### B.   History And Structure Of UOCAVA

44.   Congress enacted UOCAVA in 1986 to "facilitate absentee voting by United States citizens, both military and civilian, who are overseas." H.R. Rep. No. 99-765, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. 2009, at 2009.

45.   UOCAVA built on existing federal statutes, which Congress enacted to safeguard the fundamental nature of voting rights and to cure a potential violation of equal protection by remedying the selective distribution of the franchise to Americans who had left their State of residence and not adopted another state residence.  *See* H.R. Rep. No. 94-649, pt. 1, at 2-3 (1975), reprinted in 1975 U.S.C.C.A.N. 2358, 2359-60.

46.   Among other things, UOCAVA was enacted to supply alternative forms of voting to overseas citizens who seek to comply with state procedures but are unable to acquire or timely submit state absentee ballots.  H.R. Rep. No. 99-765, at 5-6, 1986 U.S.C.C.A.N. at 2009-10.

47.   Section 102 of UOCAVA (now codified as amended at 52 U.S.C. § 20302) reaffirms the pre-existing requirement that States must "provide for absentee registration and absentee voting by absent uniformed services voters and overseas voters."  H.R. Rep. No. 99-765, at 20, 1986 U.S.C.C.A.N. at 2024; *see*

*also* 52 U.S.C. § 20302(a)(1) (Each State shall "permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office.").

48.     Section 107 of UOCAVA defines the "overseas voter[s]" covered by section 102.  As amended, the provision defines "overseas voter" to include an absent uniformed services voter, "a person who resides outside the United States and is qualified to vote in the last place in which the person was domiciled before leaving the United States," and "a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States."  52 U.S.C. § 20310(5)(B)-(C).

49.     The same section also defines "State" as "a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa."  *Id.* § 20310(6).  Consistent with this definition, it also provides that the term "'United States,' where used in the territorial sense, means the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa."  *Id.* § 20310(8).

50.     The NMI is excluded from both definitions, meaning it is not treated as a "State" or as part of the "United States" as used in UOCAVA.  No explanation is given for this arrangement in the legislative history.

51.     In short, the effect of UOCAVA's statutory language is to provide the right to vote for President and voting representation in the U.S. House and Senate to former state residents who move to any foreign country or the NMI, but not for former state residents who move to "the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa ," drawing lines within the statutory definitions even between U.S. citizens based on the *particular* overseas Territory in which they reside – lines that do not have, and never have had, any coherent justification.

**C.     History And Structure Of The Hawaii Overseas Voting Statute**

52.     Hawaii has adopted its own provision, Hawaii UMOVA, protecting and regulating the voting rights of overseas citizens.  Hawaii UMOVA provides that U.S. citizens "living outside the United States" can vote by absentee ballot as Hawaii residents in federal elections for President and the U.S. House and Senate. H.R.S. § 15D-1 to -18.

53.     The Hawaiian statute defines the "United States," when used in the territorial sense, as "the several states, the District of Columbia, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the

jurisdiction of the United States." *Id.* at § 15D-2.  Thus, strictly read, Hawaii

UMOVA does not grant enfranchisement to former state residents who move to

*any* Territory.  Nevertheless, through the enactment of regulatory rules by the

Hawaii Office of Elections, Hawaii adheres to the requirement under UOCAVA

that former Hawaii citizens now residing in the NMI may vote absentee in federal

elections in Hawaii like "overseas" voters.  *See* H.A.R. § 3-177-600.

54.    In certain respects, Hawaii law also grants broader rights than

UOCAVA to certain non-territorial residents.  Specifically, section 15D-2 of the

Hawaii Revised Statutes explicitly grants the right to vote under Hawaii UMOVA

to U.S. citizens who are born outside of and have never resided in the United States

or registered to vote in any other State, if their parents or guardians last resided in

Hawaii before moving overseas and, absent the residence requirements, would

otherwise be eligible to vote.  *Id.*  This means that even United States citizens who

have never lived in the United States are eligible to vote in Hawaiian federal

elections, yet Hawaii state residents instantly lose their right to vote for President if

they move to Guam, the U.S. Virgin Islands, American Samoa, or Puerto Rico.

55.    Thus, under Hawaii law, former residents of Hawaii (and non-

Hawaiian-born children of such former residents) living in a foreign country, or in

the NMI, may vote in Hawaii by absentee ballot for President and voting

representation in the U.S. House and Senate, but according to the language of

Hawaii statutory law, former residents living in the "Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States" may not vote absentee for President and voting representation in Congress.  H.R.S. § 15D-2.[3]

### D.    Equal Protection Principles

56.    The Equal Protection Clause of the U.S. Constitution provides:  "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

57.    Equal-protection requirements apply both to federal and state laws. *See, e.g.*, *United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws.").

58.    The Equal Protection Clause guarantees a citizen's "right to participate in elections on an equal basis" when that right is threatened by "statutes that selectively distribute the franchise."  *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  "[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with" equal protection.  *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966).  This constitutional principle is necessary to

---

[3]    Because federal law is supreme, UOCAVA's command to allow former Hawaii residents living in the NMI to vote is also a part of Hawaii law, as reflected in H.A.R. § 3-177-600.

safeguard voters' ability to protect their stake in the affairs of government "by exercising the equal right to vote." *Evans v. Cornman*, 398 U.S. 419, 426 (1970).

59.     The right to vote is "fundamental." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  As a result, any statute that restricts the franchise is subject to strict scrutiny, and cannot be sustained unless "necessary to promote a compelling state interest." *Dunn*, 405 U.S. at 330.  Strict scrutiny applies to discriminatory expansion of the franchise, even if broader, or wholesale, limits would have been constitutionally permissible. *See Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 (1969); *Idaho Coalition United for Bears v. Cenarrusa*, 342 F.3d 1073, 1077 n.7 (9th Cir. 2003).

60.     The Supreme Court has also recognized that heightened scrutiny should be applied to laws disproportionately affecting groups, such as the territorial residents seeking redress here, that have "historically been 'relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process,'" *Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982) (citation omitted).

61.     Even absent strict or otherwise heightened scrutiny, discriminatory laws are unconstitutional under the Equal Protection Clause when the discriminations they enact are arbitrary – including where the passage of time has rendered justifications that seemed rational at the time the law was enacted

arbitrary in the present day. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938) (explaining that where "the existence of a rational basis for legislation whose constitutionality is attacked" is at issue, "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist").

62.   Federal and Hawaii law grant voting rights for *certain* U.S. citizens who move overseas, while denying them to others who are similarly situated, even going so far as to draw lines based on the *particular* Territory in which a person resides.  Neither Congress nor Hawaii has offered any justification for this arbitrary classification.  Indeed, there is no proffered explanation that satisfies any potentially applicable standard of review.

## <u>CLAIM FOR RELIEF</u>

**UOCAVA And The Hawaii Statute Violate The Equal-Protection And Due Process Guarantees Under The Fifth And Fourteenth Amendments And 42 U.S.C. § 1983 By Treating Differently Former State Residents Depending On Where They Now Reside Outside The States**

Plaintiffs incorporate by reference paragraphs 1 through 62 as if set forth here in full.

63.   By treating similarly situated former state residents differently based on where they reside overseas, UOCAVA and Hawaii UMOVA violate the equal-protection and due process guarantees of the Fifth and Fourteenth Amendments

and 42 U.S.C. § 1983.  The two acts protect the voting rights of *certain* U.S. citizens who live outside the States in *certain* overseas Territories or foreign countries, while denying those rights to similarly situated U.S. citizens who live in *other* overseas Territories.

64.     No legislature has articulated a legitimate justification for this arbitrary and discriminatory treatment of overseas citizens.  There is no present-day justification for the discriminatory treatment, rendering the laws unconstitutional even pursuant to rational-basis review, much less the constitutionally required heightened scrutiny.

65.     By reason of the foregoing, Defendants, acting under color of federal and state law, have deprived and will continue to deprive Plaintiffs of equal protection under the law secured to them by the Fourteenth Amendment and the Fifth Amendment, and protected against state interference specifically by 42 U.S.C. § 1983.

//

//

//

//

//

//

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request of this Court the following equitable relief:

a.  An order—

    i.  Declaring that UOCAVA, Hawaii UMOVA, and H.A.R. § 3-177-600 violate the equal protection guarantees of the Fifth and Fourteenth Amendments, and violate 42 U.S.C. § 1983, by extending absentee voting privileges to former Hawaii residents living foreign countries or NMI but not to former Hawaii residents living in Puerto Rico, Guam, the U.S. Virgin Islands, or American Samoa;

    ii.  Striking and ordering unenforceable the inclusion of "the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa" in the definition of "United States" in 52 U.S.C. § 20310(8) because the inclusion of such language has the unconstitutional effects described in paragraphs 44-51, above; and

    iii.  Striking and ordering unenforceable the inclusion of "Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction

of the United States" in the definition of "United States" in H.R.S. § 15D-2 because the inclusion of such language has the unconstitutional effects described in paragraphs 52 through 55, above.;

b. A preliminary and permanent order enjoining the enforcement of 52 U.S.C. § 20310, H.R.S. § 15D-2, and H.A.R. § 3-177-600 by Defendants, their respective agents, servants, employees, attorneys, successors, and all persons acting in concert with each or any of them, in a manner that violates the Fifth Amendment, the Fourteenth Amendment, or 42 U.S.C. § 1983 by implementing these provisions in such a way as to extend the right to vote absentee or accept absentee ballots on a basis that discriminates against Plaintiffs relative to other similarly situated former Hawaii residents by denying the former the right to vote absentee while extending that right to the latter based on their current residency in a foreign country or the NMI or other U.S. Territories not specifically named in 52 U.S.C. § 20310(8);

c. Attorneys' fees and costs to which Plaintiffs might be entitled by law; and

d.  Such other and further relief as this Court may deem just and

appropriate.

DATED: Honolulu, Hawaii, May 14, 2021

Respectfully submitted,

/s/*Anthony "T.J." Quan*

_____

ANTHONY "T.J."  QUAN
GEOFFREY M. WYATT
(*Pro Hac Vice*)
NICOLE M. CLEMINSHAW
(*Pro Hac Vice*)
ANDREW C. HANSON
(*Pro Hac Vice*)
ZACHARY W. MARTIN
(*Pro Hac Vice*)
NEIL C. WEARE
(*Pro Hac Vice*)
VANESSA WILLIAMS
 (*Pro Hac Vice*)
PAMELA COLON
 (*Pro Hac Vice*)

*Attorneys for Plaintiffs*