ANTHONY "T.J." QUAN, ESQ.          7903
THE QK GROUP
707 Richards Street, PH-7
Honolulu, Hawaii 96813
Phone: (808) 358-7345
Email: tjquan@qkgrouplaw.com

GEOFFREY M. WYATT          [D.C. 498650]
(*Pro Hac Vice*)
SHAY DVORETZKY          [D.C. 498527]
(*Pro Hac Vice*)
NICOLE M. CLEMINSHAW  [D.C. 888314401]
(*Pro Hac Vice*)
ANDREW C. HANSON          [D.C. 888273742]
(*Pro Hac Vice*)
PARKER RIDER-LONGMAID  [D.C. 1552207]
(*Pro Hac Vice*)
1440 New York Avenue N.W.
Washington, D.C. 20005
Phone: (202) 371-7000
Email: geoffrey.wyatt@probonolaw.com

ZACHARY W. MARTIN          [D.C. 888304074]
(*Pro Hac Vice*)
500 Boylston Street
Boston, Massachusetts 02116
Phone: (617) 573-4800
Email: zachary.martin@probonolaw.com

NEIL C. WEARE          [D.C. 997220]
(*Pro Hac Vice*)
Equally American Legal Defense and Education
Fund
1300 Pennsylvania Ave., N.W., #190-413
Washington, D.C. 20004
Phone: (202) 304-1202
Email: nweare@equallyamerican.org

VANESSA WILLIAMS          [Guam 1101]
(*Pro Hac Vice*)

Law Office of Vanessa Williams P.C.
414 West Soledad Avenue, GCIC Building,
Suite 500
Hagåtña, Guam 96910
Phone: (671) 477-1389

PAMELA COLON       [U.S. Virgin Islands 801]
(*Pro Hac Vice*)
Law Offices of Pamela Lynn Colon, LLC
27 & 28 King Cross Street, First Floor
Christiansted, Saint Croix, Virgin Islands 00820
Phone: (340) 719-7100

Attorneys for Plaintiffs
VICENTE TOPASNA BORJA,
EDMUND FREDERICK SCHROEDER, JR.,
RAVINDER SINGH NAGI,
PATRICIA ARROYO RODRIGUEZ,
LAURA CASTILLO NAGI, and
EQUALLY AMERICAN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| VICENTE TOPASNA BORJA, EDMUND FREDERICK SCHROEDER, JR., RAVINDER SINGH NAGI, PATRICIA ARROYO RODRIGUEZ, LAURA CASTILLO NAGI, and EQUALLY AMERICAN, | No. CV 20-00433 JAO-RT<br><br>Honorable Judge Jill A. Otake<br><br>Honorable Magistrate Judge Rom Trader |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| SCOTT NAGO, in his official capacity as the Chief Election Officer for the Hawaii Office of Elections, | |

GLEN TAKAHASHI,
  in his official capacity as Clerk of the
  City and County of Honolulu,

UNITED STATES OF AMERICA,

LLOYD J. AUSTIN III,
  in his official capacity as the Secretary
  of Defense,

FEDERAL VOTING ASSISTANCE
  PROGRAM, and

DAVID BEIRNE,
  in his official capacity as Director of the
  Federal Voting Assistance Program,

              Defendants.

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................ iii

BACKGROUND ........................................................................ 3

STANDARD ............................................................................ 7

ARGUMENT ........................................................................... 8

I.      UOCAVA and UMOVA violate equal protection by denying former
        state residents living in disfavored territories the same right to vote
        that they give to U.S. citizens living anywhere else on Earth. ........................9

        A.      Because they discriminatorily deny the vote, UOCAVA and
                UMOVA are subject to strict scrutiny, which they cannot
                satisfy ....................................................................12

                1.      UOCAVA and UMOVA are subject to strict scrutiny
                        because they selectively withhold the right to vote. .................12

                2.      UOCAVA and UMOVA fail strict scrutiny. ...........................17

                3.      Defendants' potential counterarguments lack merit. ................20

        B.      Alternatively, UOCAVA and UMOVA are subject to
                heightened scrutiny, which they fail, because they discriminate
                against a suspect class that is politically powerless. ...........................24

                1.      UOCAVA and UMOVA target members of a quasi-
                        suspect class and thus are subject to at least heightened
                        scrutiny. ....................................................................24

                2.      UOCAVA and UMOVA cannot satisfy heightened
                        scrutiny. ....................................................................28

                3.      Defendants' potential counterarguments lack merit. ................28

        C.      UOCAVA and UMOVA cannot survive even rational basis
                review because they are arbitrary and irrational. ................................30

1.     To satisfy rational basis review, a statute must advance some legitimate governmental purpose *today*. .........................30

2.     UOCAVA and UMOVA are unconstitutionally irrational.......31

II.   The proper remedy is to sever UOCAVA and UMOVA so that they extend federal absentee voting rights to all former state residents living in foreign countries or U.S. territories. ...............................35

CONCLUSION ....................................................................................40

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)..................................................................10

*Attorney General of Territory of Guam v. United States*,
738 F.2d 1017 (9th Cir. 1984) ......................................................22

*Barr v. American Association of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020)................................................................36

*Borja v. Nago*,
No. 20-00433, 2021 WL 4005990
(D. Haw. Sept. 2, 2021) ....................................................21, 35, 39

*Boumediene v. Bush*,
553 U.S. 723 (2008)..................................................................26

*Bush v. Gore*,
531 U.S. 98 (2000).....................................................................14

*Califano v. Gautier Torres*,
435 U.S. 1 (1978) (per curiam).................................................28, 29

*Califano v. Westcott*,
443 U.S. 76 (1979)....................................................................37

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................................................................7

*Charfauros v. Board of Elections*,
249 F.3d 941 (9th Cir. 2001) ....................................11, 13, 17, 18

*Cipriano v. City of Houma*,
395 U.S. 701 (1969) (per curiam)...........................................15, 32

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985)..............................................................11, 31

*Davis v. Guam,*
    932 F.3d 822 (9th Cir. 2019) ..........................................................39

*Dias v. City and County of Denver,*
    567 F.3d 1169 (10th Cir. 2009) ....................................................31

*Downes v. Bidwell,*
    182 U.S. 244 (1901)..............................................................25, 26

*Dunn v. Blumstein,*
    405 U.S. 330 (1972)..............................................................*passim*

*Evans v. Cornman,*
    398 U.S. 419 (1970).............................................................*passim*

*Financial Oversight & Management Board v.*
    *Aurelius Investment LLC,*
    140 S. Ct. 1649 (2020)..................................................30, 32, 33

*Frontiero v. Richardson,*
    411 U.S. 677 (1973)..................................................................37

*Harper v. Virginia State Board of Elections,*
    383 U.S. 663 (1966)..................................................................13

*Harris v. Rosario,*
    446 U.S. 651 (1980) (per curiam)........................................28, 29

*Heckler v. Mathews,*
    465 U.S. 728 (1984)............................................................36, 37

*Holt Civic Club v. City of Tuscaloosa,*
    439 U.S. 60 (1978)....................................................................20

*Hussey v. City of Portland,*
    64 F.3d 1260 (9th Cir. 1995) .....................................................10

*Idaho Coalition United for Bears v. Cenarrusa,*
    342 F.3d 1073 (9th Cir. 2003) .............................................*passim*

*Igartúa de la Rosa v. United States,*
    32 F.3d 8 (1st Cir. 1994) (per curiam)...............................22, 33

iv

*Igartúa v. United States*,
    626 F.3d 592 (1st Cir. 2010)..........................................................................28

*Jimenez v. Weinberger*,
    417 U.S. 628 (1974)......................................................................................37

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) (per curiam) ......................................10, 25, 26

*Katzenbach v. Morgan*,
    384 U.S. 641 (1966)......................................................................................22

*Kramer v. Union Free School District No. 15*,
    395 U.S. 621 (1969)..........................................................................15, 18, 19

*Leary v. United States*,
    395 U.S. 6 (1969)..................................................................................34, 39

*Lee v. City of Los Angeles*,
    908 F.3d 1175 (9th Cir. 2018) ........................................................................7

*Levin v. Commerce Energy, Inc.*,
    560 U.S. 413 (2010)......................................................................................36

*Lopez Lopez v. Aran*,
    844 F.2d 898 (1st Cir. 1988)..........................................................................27

*Lubin v. Panish*,
    415 U.S. 709 (1974)......................................................................................14

*Mathews v. Lucas*,
    427 U.S. 495 (1976)......................................................................................31

*Obergefell v. Hodges*,
    576 U.S. 644 (2015)................................................................................29, 33

*Plyler v. Doe*,
    457 U.S. 202 (1982)......................................................................................24

*Reynolds v. Simms*,
    377 U.S. 533 (1964)................................................................................11, 13

*Rodriguez v. Popular Democratic Party*,
   457 U.S. 1 (1982)....................................................................................17, 21

*Romer v. Evans*,
   517 U.S. 620 (1963)......................................................................................30, 31

*Romeu v. Cohen*,
   265 F.3d 118 (2d Cir. 2001) ....................................................................22, 33

*Sabangan v. Powell*,
   375 F.3d 818 (9th Cir. 2004) ........................................................................35

*San Antonio Independent School District v. Rodriguez*,
   411 U.S. 1 (1973)...............................................................................................24

*Segovia v. United States*,
   880 F.3d 384 (7th Cir. 2018) ...........................................................21, 22, 34

*Sessions v. Morales-Santana*,
   137 S. Ct. 1678 (2017)..............................................................................*passim*

*Shelby County v. Holder*,
   570 U.S. 529 (2013).........................................................................................31

*Smith v. Califano*,
   597 F.2d 152 (9th Cir. 1979) .........................................................................8

*United States v. Carolene Products Co.*,
   304 U.S. 144 (1938)..............................................................13, 27, 31, 34

*United States v. Cotto-Flores*,
   970 F.3d 17 (1st Cir. 2020)......................................................25, 28, 29, 30

*United States v. Virginia*,
   518 U.S. 515 (1996).........................................................................10, 24, 28

*United States Department of Agriculture v. Moreno*,
   413 U.S. 528 (1973)..........................................................................................31

*United States Small Business Administration v. Bensal*,
   853 F.3d 992 (9th Cir. 2017) ........................................................................8

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886)......................................................................1, 11, 13, 39

## STATUTES

U.S. Const. art. II ...........................................................................................14

U.S. Const. amend. XII ..................................................................................14

U.S. Const. amend. XIV ...................................................................................9

U.S. Const. amend. XXIII ..............................................................................14

52 U.S.C. § 20301 .............................................................................................4

52 U.S.C. § 20302...........................................................................................4, 37

52 U.S.C. § 20310 ...........................................................................................39

Hawaii Revised Statute § 15D-2....................................................................39

## RULES

Federal Rule of Civil Procedure 56(a) .............................................................7

H.A.R. § 3-177-600.........................................................................................1, 5

## OTHER AUTHORITIES

Department of Defense Instruction 1000.04 (Sept. 13, 2012)...................4

Exec. Order No. 12,642, 53 Fed. Reg. 21 (June 8, 1988)..........................4

Harris County Electronic Absentee Systems for Elections
Technical Proposal, https://www.fvap.gov/uploads/
FVAP/Grants/Harris_application.pdf ...........................................6

H.R. Rep. No. 94-649 (1975).......................................................3, 33, 38

H.R. Rep. No. 99-765 (1986)...............................................................3

Tom C.W. Lin, *Americans, Almost and Forgotten*,
107 Cal. L. Rev. 1249 (2019) .......................................................26

S. Rep. No. 93-1016 (1974) ...................................................................37

Tr. of Oral Arg., *United States v. Vaello Madero*,
No. 20-303 (U.S. Nov. 9, 2021) ......................................................10, 26, 29

U.S. Census Bureau, QuickFacts: Puerto Rico,
https://www.census.gov/quickfacts/PR .......................................................27

U.S. Census Bureau, *Recent Population Trends for the U.S. Island Areas:*
*2000 to 2010*, (Apr. 2015),
https://www.census.gov/content/dam/Census/library/
publications/2015/demo/p23-213.pdf ...........................................................27

U.S. Census Bureau, *Thousands of U.S. Veterans Call the Island Areas*
*Home* (May 2, 2016), https://www.census.gov/newsroom/blogs/
random-samplings/2016/05/thousands-of-u-s-veterans-call-the-
island-areas-home.html...............................................................................26

U.S. Election Assistance Comm'n, *Voting from Abroad:*
*A Survey of UOCAVA Voters*, App'x E (2008),
https://www.eac.gov/sites/default/files/event_document/files/
survey%20of%20uocava%20voters%20public%20meeting
%20march%2020%202008.pdf.......................................................................5

U.S. Gov't Accountability Off., GAO-06-521, *Elections:*
*Absentee Voting Assistance to Military and Overseas Citizens*
*Increased for the 2004 General Election, but Challenges Remain*
(Apr. 2006), https://www.gao.gov/assets/250/249640.pdf ........................5, 6

Sam Howe Verhovek, *Giant Leap for the Space Crowd: Voting*,
N.Y. Times, Aug. 26, 1997, http://www.nytimes.com/
1997/08/26/us/giant-leap-for-the-space-crowd-voting.html .........................6

This case is about whether federal and state governments may extend the right to vote to favored U.S. citizens who move outside the 50 states while arbitrarily denying it to certain disfavored citizens.  The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. §§ 20301–20311, and Hawaii law implementing it, the Uniform Military and Overseas Voters Act ("UMOVA"), H.R.S. §§ 15D-1 to -18, and UMOVA regulations, H.A.R. § 3-177-600(d), draw a discriminatory line: They protect the right to vote of some overseas citizens while restricting it for others.  They extend the right to vote for President and voting representation in Congress to every U.S. citizen who once resided in a state and now lives in a foreign country or in favored U.S. territories like the Northern Mariana Islands ("NMI"). *See* Fed. Defs.' Mot. Dismiss 4 ("at least fourteen territories").  Yet they deny that same right to former state residents now living in the disfavored territories of Guam, the U.S. Virgin Islands, Puerto Rico, or American Samoa.  Thus, a former Hawaii resident may vote in federal elections if she moves anywhere in the world outside the 50 states—including any foreign country or favored territory—*except* one of these four disfavored territories.

This discrimination strikes at the heart of a fundamental right and violates the Constitution's guarantee of equal protection.  As the Supreme Court has long recognized, the right to vote is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  Thus, while the government is not always obligated to

extend the vote, when it does, it must do so uniformly among similarly situated voters.  If it extends the vote with an uneven hand, as here, that legislative choice is subject to strict scrutiny and must be narrowly tailored to serve a compelling government interest.  Because these laws selectively deny the fundamental right to vote, they must satisfy strict scrutiny.  At the very least, heightened scrutiny applies because residents of the disfavored territories are a quasi-suspect class, a politically powerless minority that has long endured exclusion and discrimination.

In the end, these statutes cannot withstand even rational basis scrutiny because the discriminatory line is simply irrational and arbitrary.  Selectively withholding the vote for President and voting representation in Congress from former state residents who now live in Guam, the U.S. Virgin Islands, Puerto Rico, or American Samoa—and who are subject there to federal law—while extending it to those who live in foreign countries or other U.S. territories does not advance *any* legitimate interest.  Indeed, this discrimination directly undercuts Congress's stated purpose in enacting UOCAVA's predecessor of remedying the "highly discriminatory" treatment of overseas voters.

Plaintiffs are entitled to summary judgment.  UOCAVA and UMOVA violate equal protection by selectively and irrationally denying Plaintiffs' right to vote.  Had Congress been apprised of the constitutional violation, UOCAVA would have extended the vote to former state residents who moved anywhere in the

world.  The entire purpose of UOCAVA was to extend the vote evenly to U.S. citizens abroad, so the only way to honor UOCAVA's enacted text and purpose is to sever the law to extend the vote to U.S. citizens who leave a state and move to any territory or foreign country.

## BACKGROUND

A.     When a U.S. citizen moves outside the fifty states, she loses the right to vote for President and voting representation in Congress unless Congress or her former state of residence legislates otherwise.  Recognizing the fundamental importance of a U.S. citizen's right to vote, federal and state law, including Hawaii's, have for many years extended federal absentee voting rights to U.S. citizens who would otherwise be disenfranchised because they live overseas.

More than forty-five years ago, Congress responded to inconsistencies in such state laws by passing the Overseas Citizens Voting Rights Act of 1975 ("OCVRA").  *See* H.R. Rep. No. 94-649, pt. 1, at 2 (1975).  Preexisting state laws governing overseas voting often extended voting rights to military personnel and federal employees residing overseas, but withheld the same rights from "private citizen[s]" residing overseas.  *Id.* at 1-3.

In 1986, Congress enacted UOCAVA, which "consolidated and updated" OCVRA and other laws affecting overseas voters.  H.R. Rep. No. 99-765, at 6-7 (1986).  UOCAVA requires every state to allow U.S. citizens who formerly resided

in the state to vote absentee for President and voting representation in Congress if they move to a foreign country or the NMI or certain other territories—but *not* if they move to the disfavored territories of Puerto Rico, Guam, the U.S. Virgin Islands, or American Samoa.

Specifically, UOCAVA requires each state to allow "overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office," 52 U.S.C. § 20302(a)(1), which includes President, Vice President, and representation in Congress, *id.* § 20310(3). An "overseas voter" includes, as relevant here, "a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States." *Id.* § 20310(5)(C). And the "'United States,' where used in the territorial sense, means the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa"—but *not* the NMI or other territories *see id.* § 20310(8).[1]

---

[1] UOCAVA vests primary responsibility for enforcement of its requirements in a "Presidential designee." 52 U.S.C. § 20301(a). The current designee is the Secretary of Defense, *see* Exec. Order No. 12,642, 53 Fed. Reg. 21, 975, 21,975 (June 8, 1988), currently defendant Lloyd J. Austin III. The Secretary's authority has been delegated to the Federal Voting Assistance Program ("FVAP"), whose director (defendant David Beirne) has the authority to administer FVAP and carry out its statutorily assigned functions and responsibilities. *See* Department of Defense Instruction 1000.04 & Encl. 3 (Sept. 13, 2012).

In Hawaii, UMOVA implements these federal requirements.  UMOVA provides that U.S. citizens "living outside the United States" can vote by absentee ballot as Hawaii residents in federal elections for President and the U.S. House and Senate.  H.R.S. §§ 15D-1 to -18.  UMOVA defines the "United States" as "the several states, the District of Columbia, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States."  *Id.* at § 15D-2.  UMOVA itself does not extend the vote to former state residents who move to any U.S. territory.  But regulations enforcing UOCAVA permit former Hawaii citizens now residing in the NMI to vote absentee in federal elections in Hawaii just like "overseas" voters.  *See* H.A.R. § 3-177-600.

Thus, federal and state law jointly deny the franchise to former state residents of Hawaii living in Guam, the U.S. Virgin Islands, Puerto Rico, and American Samoa, despite broadly extending that right to those former residents who move to a foreign country or the NMI.  If after leaving Hawaii a U.S. citizen moves to the NMI or any foreign country—or even Antarctica or the International Space Station[2]—she retains the right to vote for President and voting members of

---

[2]    *See, e.g.*, U.S. Election Assistance Comm'n, *Voting from Abroad: A Survey of UOCAVA Voters*, App'x E (2008), https://www.eac.gov/sites/default/files/event _document/files/survey%20of%20uocava%20voters%20public%20meeting%20m arch%2020%202008.pdf; U.S. Gov't Accountability Off., GAO-06-521, *Elections: Absentee Voting Assistance to Military and Overseas Citizens Increased for the 2004 General Election, but Challenges Remain* 14 (Apr. 2006),

*(cont'd)*

the U.S. House and Senate.  But while UOCAVA and UMOVA extend absentee voting rights for President and voting representation in Congress all over the world, they selectively deny those rights to former state residents living in Guam, Puerto Rico, the U.S. Virgin Islands, and American Samoa—all territories subject to Congress's reach.

B.    Individual Plaintiffs Vicente Topasna Borja, Dr. Edmund Frederick Schroeder, Jr., Ravinder Singh Nagi, Patricia Arroyo Rodriguez, and Laura Castillo Nagi are U.S. citizens and former Hawaii residents who are denied the right to vote in federal elections because they reside in Guam or the U.S. Virgin Islands.  (*See generally* Concise Statement of Facts.)  As explained in the statement of facts, some of the plaintiffs have served their country in military or federal civil office.  All of them would choose to vote for President and voting representation in Congress by absentee ballot in Hawaii if allowed to do so.  (*See id.* ¶ 43.)

For example, Plaintiff Vicente "Ben" Borja was born and raised on Guam. During the Vietnam War, he volunteered to serve in the U.S. Navy.  In 1990, while serving in Japan, he secured reassignment to Hawaii so that his wife could undergo cancer treatment.  But after his wife's health worsened, Mr. Borja obtained

---

https://www.gao.gov/assets/250/249640.pdf; Harris County Electronic Absentee Systems for Elections Technical Proposal at 3, https://www.fvap.gov/uploads/FVAP/Grants/Harris_application.pdf; Sam Howe Verhovek, *Giant Leap for the Space Crowd: Voting,* N.Y. Times, Aug. 26, 1997, http://www.nytimes.com/1997/08/26/us/giant-leap-for-the-space-crowd-voting.html.

reassignment back home to Guam so that his wife could spend her final days surrounded by friends and family.  After his wife's death, Mr. Borja finished out his 28 years of Navy service on Guam.  As a wartime veteran, Mr. Borja believes he should have the right to vote for President and voting representation in Congress—which federal and state law would have protected had he moved, after living in Hawaii, either back to Japan or 50 miles north of Guam to the NMI. (Concise Statement of Facts ¶¶ 1-6.)

Organizational plaintiff Equally American Legal Defense and Education Fund ("Equally American") is a nonprofit advocacy organization with members who once lived in Hawaii and now live in Guam, the U.S. Virgin Islands, Puerto Rico, and American Samoa.  (*See id.* at ¶¶ 29-30.)  Equally American believes that allowing former Hawaii residents residing in U.S. territories to enjoy the same voting rights as other former Hawaii residents now living overseas would provide new opportunities for political engagement on the issues and causes that Equally American supports in these areas and at a national level.  (*See id.* at ¶¶ 31-32.)

## **STANDARD**

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Lee v. City of Los Angeles*, 908

F.3d 1175, 1182 (9th Cir. 2018).  Summary judgment is appropriate where, as here, the dispute turns on the proper interpretation of the Constitution and laws rather than factual disagreement.  *See, e.g.*, *U.S. Small Bus. Admin. v. Bensal*, 853 F.3d 992, 996 (9th Cir. 2017); *Smith v. Califano*, 597 F.2d 152, 155 n. 4 (9th Cir. 1979).

## ARGUMENT

The Court should grant summary judgment to Plaintiffs because UOCAVA and UMOVA violate their constitutional right to equal protection of the laws. Defendants do not dispute that UOCAVA and UMOVA deny the individual Plaintiffs the right to vote for President and voting representation in Congress just because they live outside the 50 states.  The statutes withhold from Plaintiffs the fundamental right to vote for representation in the federal government that makes laws extending to the territories in which they live.  At the same time, the statutes protect the vote for other U.S. citizens overseas who, in most cases, live much farther from the reach of federal law.  Under controlling Supreme Court precedent, this Court thus must ask whether UOCAVA and UMOVA satisfy strict scrutiny, which requires narrow tailoring to promote a compelling government interest. What's more, the statutes also discriminate against a quasi-suspect class, triggering heightened scrutiny requiring the challenged law to substantially advance important governmental objectives.  But UOCAVA and UMOVA cannot satisfy even rational basis review because they do not advance *any* legitimate interest.

8

The Court should remedy the equal protection violation by declaring UOCAVA and UMOVA unconstitutional to the extent they deny to former Hawaii residents living in Guam, the U.S. Virgin Islands, Puerto Rico, or American Samoa the same federal absentee voting rights that they extend to former Hawaii residents living in foreign countries or the NMI.  The Court should further hold that, had Congress known of this constitutional infirmity, it would have preferred to extend voting rights to former state residents living in the territories than to withdraw those rights from former state residents living abroad.  Only extension of voting rights accords with UOCAVA's overarching purpose, because withdrawing voting rights would nullify the statute altogether.  Thus, the Court should sever and order unenforceable the exclusionary language in UOCAVA and UMOVA so that former Hawaii residents living in all U.S. territories share the same right to vote as their counterparts in foreign countries and the NMI.

I.    **UOCAVA and UMOVA violate equal protection by denying former state residents living in disfavored territories the same right to vote that they give to U.S. citizens living anywhere else on Earth.**

The Constitution requires the states and federal government alike to afford all persons "the equal protection of the laws."  U.S. Const. amend. XIV, § 1; *see Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 & n.1 (2017) (the equal protection "guarantee implicit in the Fifth Amendment's Due Process Clause" "is precisely the same" as Fourteenth Amendment's Equal Protection Clause (citation

omitted)).  UOCAVA and UMOVA violate that guarantee.  Both laws discriminate against U.S. citizens who live in certain U.S. territories.  They extend the vote for federal office to former state residents who move to a foreign country or the NMI, but deny it to former state residents living in Guam, the U.S. Virgin Islands, Puerto Rico, or American Samoa.  That disparate treatment of U.S. citizens as to a fundamental right does not advance *any* legitimate governmental interest, much less substantially promote an important or compelling one.

The Supreme Court analyzes equal protection claims under a three-tiered approach:  Statutes that infringe fundamental rights or discriminate on the basis of race are subject to strict scrutiny.  *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 220 (1995) (race); *Dunn v. Blumstein*, 405 U.S. 330, 337 (1972) ("strict review" for voting restrictions); *Hussey v. City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995) (applying strict scrutiny and striking down an ordinance burdening the right to vote).  As the United States recently told the Supreme Court, that rule applies in the territories.  Tr. of Oral Arg. 35:20-36:6, *United States v. Vaello-Madero*, No. 20-303 (U.S. Nov. 9, 2021) (colloquy between Justice Gorsuch and Curtis Gannon, Deputy Solicitor General).  Statutes that discriminate on the basis of sex or against a quasi-suspect class are subject to heightened scrutiny.  *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 555 (1996) (sex); *Karnoski v. Trump*, 926 F.3d 1180, 1200 & n.17 (9th Cir. 2019) (per curiam)

10

(transgender status).  All other laws must satisfy rational-basis review, meaning that they "must be rationally related to a legitimate governmental purpose."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).

Voting triggers strict scrutiny because it is "a 'fundamental political right' . . . 'preservative of other basic civil and political rights.'"  *Charfauros v. Bd. of Elections*, 249 F.3d 941, 950-51 (9th Cir. 2001) (quoting *Yick Wo*, 118 U.S. at 370, and *Reynolds v. Simms*, 377 U.S. 533, 562 (1964)).  The Constitution's equal protection principle "guarantees each and every person that they will not be denied their fundamental rights—including the right to vote—in an arbitrary or discriminatory manner."  *Id.* at 951.  Thus, laws restricting the vote are subject to strict scrutiny and cannot stand unless they are narrowly tailored to promote a compelling state interest.  *Id.*; *Dunn*, 405 U.S. at 336.

Even if UOCAVA and UMOVA were not subject to strict scrutiny, they would still be subject to heightened scrutiny because they selectively exclude territorial residents, a quasi-suspect class that has endured a long history of race-based discrimination.

Under *any* standard of review—even rational basis—both statutes violate equal protection because their discriminatory regime is completely irrational.  The line they draw between former state residents living in foreign countries or in the NMI, on the one hand, and other former state residents living in certain disfavored

11

territories is altogether arbitrary.  It is not rationally related to any government interest, and it withholds the vote from U.S. citizens subject to federal power.  And even if UOCAVA advanced some government interest when it was enacted more than thirty-five years ago, it surely does not today.

### A.   Because they discriminatorily deny the vote, UOCAVA and UMOVA are subject to strict scrutiny, which they cannot satisfy.

UOCAVA and UMOVA's selective exclusion of certain territorial residents infringes the fundamental right to vote based solely on geographic accident and is therefore subject to strict scrutiny.  *See Dunn*, 405 U.S. at 335-37; *Evans v. Cornman*, 398 U.S. 419, 421-22 (1970).  UOCAVA and UMOVA extend federal absentee voting rights in a discriminatory fashion and therefore must be narrowly tailored to serve a compelling government interest.  They cannot satisfy that test.

### 1.   UOCAVA and UMOVA are subject to strict scrutiny because they selectively withhold the right to vote.

UOCAVA and UMOVA and its implementing regulations are subject to strict scrutiny because they extend the fundamental right to vote in a discriminatory fashion.  Both laws selectively extend the right to vote for federal office beyond current state residents to former state residents who move to a foreign country or the NMI or certain other territories while denying that same right to those who move to four disfavored territories.  This sort of discriminatory extension of voting rights is subject to strict scrutiny because the right to vote, once

extended, is fundamental, and only the most compelling circumstances can justify

distinctions between similarly situated individuals.  Here, the disparate treatment is

particularly troubling because it denies the vote to those subject to the reach and

authority of the federal government.

      **a.**      The right to vote is fundamental.  *E.g.*, *Yick Wo*, 118 U.S. at 370.

"Because our democracy was founded on the principle that 'the right to exercise

the franchise in a free and unimpaired manner is preservative of other basic civil

and political rights,' our courts vehemently protect every citizen's right to vote,

carefully and meticulously scrutinizing any alleged infringement." *Charfauros*,

249 F.3d at 951 (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)).  Courts

must scrutinize limitations on the right to vote because, by their nature, such

limitations "restrict[] those political processes which can ordinarily be expected to

bring about repeal of undesirable legislation." *United States v. Carolene Prods.*

*Co.*, 304 U.S. 144, 153 n.4 (1938).  Put simply, the political process cannot be

expected to fix statutes that lock certain citizens out of that very process.  So "once

the franchise is granted to the electorate, lines may not be drawn which are

inconsistent with" equal protection.  *Evans*, 398 U.S. at 422 (quoting *Harper v. Va.*

*State Bd. of Elections*, 383 U.S. 663, 665 (1966)).  In short, when the government

"chooses to grant the right to vote in a particular form," even though it could have

"decline[d] to grant [that] right" in the first instance, "it subjects itself to the

requirements of the Equal Protection Clause." *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1077 & n.7 (9th Cir. 2003).

The fundamental nature of the right does not depend on whether the right is based on the Constitution or statute.  The point is that if there are elections, every "citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336.  The equal protection guarantee "confers the substantive right to participate on an equal basis with other qualified voters whenever the State has adopted an electoral process for determining who will represent any segment of the State's population." *Lubin v. Panish*, 415 U.S. 709, 713 (1974).

Voting for President is a prime example:  The Constitution provides only that the President must be selected by the Electoral College, and does not compel States to put the selection of Electors to a democratic vote.  *See* Const. art. II, § 1; U.S. Const. amends. XII, XXIII; *Bush v. Gore*, 531 U.S. 98, 104 (2000) (despite "[h]istory" having "favored the voter," a State still may, "if it so chooses, select the electors" for President "itself").  Yet the right to vote for President, once extended by statute, is fundamental.  *Bush*, 531 U.S. at 104.

A law withholding the right to vote, once extended, from "citizens who are primarily or substantially interested in or affected by electoral decisions" "must meet close constitutional scrutiny." *Evans*, 398 U.S. at 422.  That "strict review"

means that "if a challenged statute grants the right to vote to some citizens and denies the franchise to others, 'the Court must determine whether the exclusions are necessary to promote a compelling state interest.'" *Dunn*, 405 U.S. at 337 (citation omitted).  Based on this logic, courts have applied strict scrutiny to restrictions on votes for school boards, revenue bonds, and all kinds of elections not mentioned in the Constitution. *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 (1969) (school board); *Cipriano v. City of Houma*, 395 U.S. 701 (1969) (per curiam) (utility revenue bond).

In *Kramer*, for example, the Supreme Court examined a New York statute that limited elections for school board to certain voters presumed to be most interested.  395 U.S. at 622 (opinion of the Court); *see also id.* at 635 (Stewart, J., dissenting).  Even though there is no freestanding constitutional right to vote for a school board (indeed, many "large city districts" within the same state had appointed school boards, *id.* at 622-23), the Court applied strict scrutiny to "determine whether the exclusions are necessary to promote a compelling state interest." *Id.* at 627.  The Court emphasized that "[t]he need for exacting judicial scrutiny . . . [wa]s undiminished simply because . . . the offices . . . might [constitutionally] have been filled through appointment." *Id.* at 628-29.

Similarly, in *Idaho Coalition*, the plaintiff challenged an Idaho law that required proponents of a ballot initiative "to obtain signatures of . . . six percent of

15

the qualified voters in each of at least half of [the state's] 44 counties." 342 F.3d at 1075. That requirement treated Idaho residents differently based on where they lived by giving less power to urban residents and more to residents of sparsely populated rural counties. Idaho defended the law by asserting that it had no constitutional obligation to put such initiatives to voters in the first place. *See id.* at 1077 n.7. The Ninth Circuit disagreed, holding that "when a state chooses to grant the right to vote in a particular form, it subjects itself to the requirements of the Equal Protection Clause." *Id.* The decision to extend an initiative to voters, the court reasoned, is no different as a constitutional matter from the decision to extend "the right to vote for electors for President and Vice President." *Id.*

**b.** The Supreme Court has emphasized that strict scrutiny is especially important when the individuals selectively denied the right to vote for government officials are subject to that government's power. In *Evans v. Cornman*, the Court held that Maryland could not withhold the vote from residents of a federal enclave in Maryland. 398 U.S. at 421-22. Explaining that the government would need an interest "sufficiently compelling to justify limitations on the suffrage," the Court instructed that whether residents of the enclave could be "denied the vote depends on their actual interest today." *Id.* at 422, 424. Maryland could not meet that test given the "numerous and vital ways in which [enclave] residents are affected by [Maryland] electoral decisions." *Id.* at 424. Enclave residents, the Court

16

explained, were subject to Maryland's criminal laws, Maryland taxes, Maryland unemployment laws and workers' compensation laws, vehicle registration and driver's license laws, personal jurisdiction in state court, and so on. *Id.*

  **c.**  Here, while the Constitution does not compel the government to provide voting rights to former state residents, it does not permit unconstitutional discrimination among former state residents once the government has extended voting rights. "[S]trict constitutional scrutiny" applies to voting in the territories just as it applies to voting in the fifty states. *Charfauros*, 249 F.3d at 952; *see Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 8 (1982) ("[T]he voting rights of . . . citizens of [the territories] are constitutionally protected to the same extent of those of all other citizens of the United States."). Once voting rights have been expanded by statute, strict scrutiny applies to provisions that either selectively exclude certain people from the franchise altogether, as in *Kramer* and in this case, or that selectively dilute the value of their participation, as in *Idaho Coalition*. *Evans v. Cornman* reinforces the point, because there are "numerous and vital ways in which [they] are affected" by federal electoral decisions, 398 U.S. at 424, in which U.S. citizens living abroad, often beyond the reach of federal law, are not.

  **2.**  **UOCAVA and UMOVA fail strict scrutiny.**

  UOCAVA and UMOVA cannot satisfy strict scrutiny. Strict scrutiny requires unequal treatment to be "necessary and narrowly tailored to serve [a]

compelling interest."  *Charfauros*, 249 F.3d at 952; *accord Dunn*, 405 U.S. at 337

("necessary to promote a compelling state interest" (quoting *Kramer*, 395 U.S. at

627)).  It requires "precision"—a showing, for example, that "all those excluded

are in fact substantially less interested or affected" by political decisions "than

those the statute includes."  *Kramer*, 395 U.S. at 632.  And whether particular

voters are "sufficiently disinterested in electoral decisions that they may

[constitutionally] be denied the vote depends on their actual interest today."

*Evans*, 398 U.S. at 424.

    *Kramer* provides a good example of how strict scrutiny works.  The statute

there limited the right to vote for school board to (1) owners or lessees of taxable

real property located in the district, (2) their spouses, and (3) parents or guardians

of public schoolchildren.  395 U.S. at 623.  The district contended that these

individuals "ha[d] a 'direct' stake in school affairs," through either taxation or their

children, that others lacked.  *Id.* at 631.  The Court assumed for sake of argument

that the district could limit voting to those "'primarily interested' or 'primarily

affected,'" but found the statute insufficiently tailored because it was not

"necessary to achieve the articulated state goal."  *Id.* at 632.  Specifically, the

district could not show that "*all* those excluded [were] in fact substantially less

interested or affected than those the statute included" because it permitted

"inclusion of many persons who have, at best, a remote and indirect interest, in

school affairs and, on the other hand, exclude[d] others who have a distinct and direct interest in the school meeting decisions." *Id.* at 632 (emphasis added).

UOCAVA and UMOVA fail strict scrutiny. Defendants have never articulated any compelling governmental interest that UOCAVA or UMOVA serves by excluding from the vote individuals who move to certain disfavored territories, much less why the exclusion would be necessary or narrowly tailored to achieve that goal. And even if there is some meaningful distinction between U.S. citizens who move from Hawaii to the disfavored territories and those who move to foreign countries or to certain territories like the NMI (*but see infra* pp. 31-35), that distinction does not show that every U.S. citizen who moved abroad or to the NMI is more interested in or affected by federal elections than U.S. citizens, like Plaintiffs, who move to disfavored territories. In fact, it's exactly the other way around: The federal government has broad authority over the territories and the lives of territorial residents—the very people excluded from the vote—but little power within another country's borders. To borrow from *Evans v. Cornman*, Defendants cannot "deny that there are numerous and vital ways in which [territorial] residents are affected by electoral decisions" in which they cannot participate. With a "stake equal to"—if not greater than—"that of other . . . residents," "they are entitled under the [equal protection guarantee] to protect that stake by exercising the equal right to vote." 398 U.S. at 424, 426.

19

### 3.     Defendants' potential counterarguments lack merit.

*First*, Defendants may claim that Supreme Court precedent permits the government to impose residency requirements.  But UOCAVA and UMOVA require only *former*, not *current*, residency, so they cannot be defended on the ground that only individuals currently living within Hawaii may be afforded the right to vote.  Instead, the statutes reflect the government's choice to extend voting rights beyond a state borders—and once the government does that, it must do so in a nondiscriminatory manner.  Put another way, as Congress framed UOCAVA, the relevant "jurisdiction," *Dunn*, 405 U.S. at 336, is anywhere in the world, with the selective exclusion of certain disfavored U.S. territories.  For that reason, *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68-69 (1978), which involved a request for "extraterritorial extension of the franchise," is inapplicable.  UOCAVA and UMOVA do not "legitimately restrict the right to participate in [the] political processes to those who reside within [the state's] borders." *Id.*  To the contrary, they extend the right to some who reside outside the state's borders but not others.

*Dunn* and *Evans v. Cornman* make clear that UOCAVA and UMOVA are subject to strict scrutiny.  The statutes do not make current residency a criterion.  Instead, they extend the vote to former state residents who move to foreign countries and territories like the NMI but withhold it from those who move to other U.S. territories.  Yet U.S. citizens who move to those disfavored territories—unlike

those who move abroad—are *acutely* "affected by" the decisions in which they get

no say. *Evans*, 398 U.S. at 424; *supra* pp. 16-17.

    *Second*, Defendants may point to *Segovia v. United States*, 880 F.3d 384

(7th Cir. 2018). But *Segovia*—a decision this Court has already "declined" to

follow on standing, *Borja v. Nago*, No. 20-00433, 2021 WL 4005990, at *6 (D.

Haw. Sept. 2, 2021)—did not even address the important points discussed above.

The Seventh Circuit refused to apply strict scrutiny to UOCAVA and an Illinois

state law similar in some respects to UMOVA because "residents of the territories

have no fundamental right to vote in federal elections" and "send no electors to

vote for president or vice president and have no voting members in the United

States Congress." 880 F.3d at 390. The First Circuit took a similar approach in

*Igartúa de la Rosa v. United States*, 32 F.3d 8, 10 (1st Cir. 1994) (per curiam).

    But Plaintiffs' argument does not turn on a freestanding fundamental right to

vote in the territories. The point, as explained above, is that "when a state chooses

to grant the right to vote in a particular form," it must do so in a nondiscriminatory

manner. *Idaho Coal.*, 342 F.3d at 1077 n.7. Both UOCAVA and UMOVA

implement a choice to extend voting rights abroad and to the NMI, even though

U.S. citizens living abroad or in the NMI would have no freestanding right to vote

otherwise. That choice, once made, cannot be discriminatory, so UOCAVA and

UMOVA cannot constitutionally withhold the vote from U.S. citizens who move to

U.S. territories unless they can satisfy strict scrutiny.  *See also* Br. of Voting Rights Scholars as Amicus Curiae at 6, *Segovia v. United States*, No. 17-1463 (U.S. May 23, 2018) (attached as Ex. __).  The Second Circuit's decision in *Romeu v. Cohen*, 265 F.3d 118, 123-24 (2d Cir. 2001), to apply less than strict scrutiny to UOCAVA likewise reflects a misunderstanding of these principles and the mistaken view that Congress's Article IV authority over the territories overrides them.  *Supra* p. 10.

For the same reasons, *Attorney General of Territory of Guam v. United States*, 738 F.2d 1017, 1019 (9th Cir. 1984), which held that the citizens of Guam have no express constitutional right to vote for President or Vice President, does not control here.  Plaintiffs do not assert such a right; and if anything, *Attorney General of Guam* is relevant only to the extent it recognized Congress's constitutional power to authorize absentee voting based on "prior residence in a state" under the OCVRA, the predecessor to UOCAVA.  *See id.* at 1020.

*Finally*, Defendants may contend that rational basis review applies because UOCAVA and UMOVA expand rather than restrict rights, and that "a legislature need not 'strike at all evils at the same time.'"  *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) (citation omitted).  Even leaving aside the concession in *Vaello-Madero* noted above, *Katzenbach* doesn't help the government.  That case stands only for the limited proposition that Congress may constitutionally extend incremental protections regarding the qualifications of eligible voters, *not* that

Congress or the states can broadly expand the definition of eligible voters in a discriminatory fashion.  *Katzenbach* involved a challenge to a provision of the federal Voting Rights Act that barred states and localities from denying the right to vote, based on inability to read or write English, to individuals who "successfully completed the sixth primary grade in a public school in, or a private school accredited by, the Commonwealth of Puerto Rico in which the language of instruction was other than English."  *Id.* at 643.  The challengers claimed that the law "work[ed] an invidious discrimination in violation of the Fifth Amendment" by not extending the same protections to "those educated in schools beyond the territorial limits of the United States."  *Id.* at 656.  The Supreme Court applied only rational-basis review in rejecting that challenge because it reasoned that Congress could proceed incrementally with "a reform measure aimed at eliminating an existing barrier to the exercise of the franchise."  *Id.* at 657.

*Katzenbach* is nothing like this case, which involves not an incremental expansion of rights but a broad expansion that singles out particular groups for exclusion.  And perhaps more to the point, the law at issue in *Katzenbach* merely removed a state-law language barrier for otherwise-eligible voters—it did not leave an entire group of voters ineligible altogether.  And, as explained below, UOCAVA and UMOVA improperly single out insular groups for exclusion and thus are inherently suspect.  *See infra* pp. 24-30.

23

**B.     Alternatively, UOCAVA and UMOVA are subject to heightened scrutiny, which they fail, because they discriminate against a suspect class that is politically powerless.**

Even putting well-established voting rights doctrine to the side, UOCAVA and UMOVA must do more than serve some hypothetical rational purpose. They discriminate against residents of the disfavored territories based on those individuals' status as territorial residents—a discrete and insular minority of U.S. citizens who have been excluded from participating in the political system for over a century. For that reason, heightened scrutiny is the minimum standard UOCAVA and UMOVA must satisfy. A discriminatory classification requires an exceedingly persuasive justification to satisfy heightened scrutiny—the challenged law must substantially advance actual and important governmental objectives. *Virginia*, 518 U.S. at 535-36. Defendants cannot make that showing.

**1.     UOCAVA and UMOVA target members of a quasi-suspect class and thus are subject to at least heightened scrutiny.**

The Supreme Court has recognized that courts must closely scrutinize laws that discriminate against groups that have historically been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Plyler v. Doe*, 457 U.S. 202, 217 n.14 (1982) (citation omitted); *see also San Antonio Indep. Sch. Dist. V. Rodriguez*, 411 U.S. 1, 28 (1973) (the "traditional indicia of suspectness" also include historical subjection to "purposeful unequal treatment"). The factors bearing on whether heightened

24

scrutiny is appropriate include (1) "whether the class has been historically subjected to discrimination"; (2) "whether the class has a defining characteristic that frequently bears a relation to ability to perform or contribute to society"; (3) "whether the class exhibits obvious, immutable or distinguishing characteristics that define it as a discrete group"; and (4) "whether the class is a minority or politically powerless." *Karnoski*, 926 F.3d at 1200 n.17 (citation omitted).

Territorial residents meet each of those factors. *First*, they have endured a history of "unequal treatment" that continues today and includes the ongoing denial of voting rights in, and thus participation in, the federal political process. Early 20th-century Supreme Court cases known as the *Insular Cases* reflected and reinforced that unequal treatment by holding that newly acquired overseas territories were not entitled to the Constitution's full protection because they were populated by an "alien race" differing in "religion, customs, laws, methods of taxation, and modes of thought." *Downes v. Bidwell*, 182 U.S. 244, 287 (1901).

The Court that decided the *Insular Cases* was, "[a]lmost to a man, the same Court that validated *Plessy v. Ferguson*," and it used those decisions "to validate Puerto Rico's *colonial status of inequality*." *United States v. Cotto-Flores*, 970 F.3d 17, 50 & n.23 (1st Cir. 2020) (Torruella, J., concurring). Under the prevailing understanding of the *Insular Cases* and the worldview that produced them, the United States' overseas territories, unlike those that became states, were never

25

"surely destined for statehood." *Boumediene v. Bush*, 553 U.S. 723, 757 (2008). Instead, the enduring legacy of the *Insular Cases* has been "to deny the one thing the [Supreme] Court promised to the territories—fundamental constitutional rights." Br. of Virgin Islands Bar Association at 10, *Segovia*, No. 17-1463 (U.S. May 23, 2018) (attached as Ex. __). Just earlier this month, the United States told the Supreme Court that its "position on the *Insular Cases* is that some of the reasoning and rhetoric there is obviously anathema" and that "equal protection" "applies fully" in the territories. Tr. of Oral Arg. 10, *Vaello-Madero*, No. 20-303 (U.S. Nov. 9, 2021) (Justice Gorsuch and Curtis Gannon).

*Second*, territorial residents have no characteristics preventing them from contributing to society. To the contrary, a high proportion of territorial residents have served in the U.S. military for more than a century. *See* Tom C.W. Lin, *Americans, Almost and Forgotten*, 107 Cal. L. Rev. 1249, 1275 (2019); U.S. Census Bureau, *Thousands of U.S. Veterans Call the Island Areas Home* (May 2, 2016), U.S. Census Bureau, https://www.census.gov/newsroom/blogs/random-samplings/2016/05/thousands-of-u-s-veterans-call-the-island-areas-home.html.

*Third*, the worldview reflected in the *Insular Cases* cast territorial residents as having "immutable or distinguishing characteristics" "defin[ing] [them] as a discrete group," *Karnoski*, 926 F.3d at 1200 n.17. As noted, *Downes* said that the unincorporated territories were "inhabited by alien races." 182 U.S. at 287. Yet

despite repeated calls for the *Insular Cases* to be overruled, their legacy persists in the overseas U.S. territories' seemingly interminable colonial status. *Infra* p. 28. Puerto Rico today remains nearly 99% Hispanic, U.S. Census Bureau, QuickFacts: Puerto Rico, https://www.census.gov/quickfacts/PR (visited Nov. 22, 2021), and other territories too are majority-minority, U.S. Census Bureau, *Recent Population Trends for the U.S. Island Areas: 2000 to 2010*, at 15-19 (Apr. 2015), https://www.census.gov/content/dam/Census/library/publications/2015/demo/p23-213.pdf. The inference of race- and ethnicity-based animus is unsettling.

*Finally*, territorial residents are a politically powerless group. Puerto Rico provides a telling example. "It would be difficult to imagine a more 'discrete and insular' minority, both geographically and constitutionally, than the residents of Puerto Rico"—people who, "despite their citizenship in the United States, 39 Stat. 1132 (1917), have virtually no access to 'the operation of those political processes ordinarily to be relied upon to protect minorities.'" *Lopez Lopez v. Aran*, 844 F.2d 898, 913 (1st Cir. 1988) (Torruella, J., concurring in part and dissenting in part) (quoting *Carolene Prods.*, 304 U.S. at 153 n.4). As noted, territorial residents are generally denied the right to vote for President or Vice President and lack voting representation in Congress. As the late Judge Torruella put it in terms just as apt here, it is precisely the "lack of any political power by these disenfranchised U.S. citizens, and the cat and mouse games that have been played with them by the

United States government, including its courts, that have resulted in their interminable unequal condition." *Igartúa v. United States*, 626 F.3d 592, 614 (1st Cir. 2010) (Torruella, J., concurring in part and dissenting in part).  As Puerto Rico's government has recognized, territorial residents have "little or no political power to participate in and/or influence the decisions taken by the federal government that affect their daily lives."  *See* Br. for Puerto Rico, as Amicus Curie in Support of Petitioners at 4-5, *Segovia*, No. 17-1463 (U.S. May 23, 2018).

For all these reasons, territorial residents constitute a distinct minority that has faced a history of unequal treatment and been relegated to a position of political powerlessness in the most fundamental ways.  UOCAVA and UMOVA's discriminatory regime thus must satisfy at least heightened scrutiny.

### 2.  UOCAVA and UMOVA cannot satisfy heightened scrutiny.

Under heightened scrutiny, a discriminatory "classification must substantially serve an important governmental interest *today*"— the government must supply an "'exceedingly persuasive justification.'" *Morales-Santana*, 137 S. Ct. at 1690 (quoting *Virginia*, 518 U.S. at 531).  Defendants can no more satisfy that exacting standard than they can satisfy strict scrutiny.  *See supra* pp. 17-23.

### 3.  Defendants' potential counterarguments lack merit.

*First*, Defendants may argue that the Supreme Court's decisions in *Califano v. Gautier Torres*, 435 U.S. 1 (1978) (per curiam), and *Harris v. Rosario*, 446 U.S.

651 (1980) (per curiam), require only rational basis review because Congress "may treat Puerto Rico differently from States so long as there is a rational basis for its actions," *Rosario*, 446 U.S. at 651-52. Not so. As the United States conceded earlier this month before the Supreme Court, "the Constitution applies fully" "with respect to the equal protection [guarantee]." Tr. of Oral Arg. 10, *Vaello-Madero*, No. 20-303 (U.S.). The United States further conceded that discriminatory treatment "based on racial or ethnic considerations" would also require heightened scrutiny" notwithstanding *Rosario* or *Gautier Torres*. *Id.* at 36:6-24.

That makes sense. Both decisions were summary dispositions about federal financial benefits. *Gautier Torres* was not even an equal protection case but rather a right-to-travel case. 435 U.S. at 3 & n.4. And *Rosario* involved federal block grants to needy families—problematic differential treatment, but discrimination that did not in and of itself render citizens in the territories politically powerless in the way that withholding the vote prevents democratic redress. Nothing in those opinions prevents this Court from "recogniz[ing] that new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged." *Morales-Santana*, 137 S. Ct. at 1690 (quoting *Obergefell v. Hodges*, 576 U.S. 644, 673 (2015); alteration in original).

*Second*, there is no merit to the argument that UOCAVA and UMOVA treat overseas U.S. territories differently as territories rather than treating individuals

who move there differently as individuals.  That logic ignores how the statutes regard people who move to disfavored territories as people who do not merit the vote, even though their counterparts elsewhere apparently do.  At bottom, this kind of overly deferential logic reflects the troubling legacy of the *Insular Cases* and the mistaken notion that Congress has "omnipotent powers under the territorial clause" to keep the territories stuck in a "colonial regime."  *Cotto-Flores*, 970 F.3d 51-52 (Torruella, J., concurring).  And nobody seriously thinks today that the *Insular Cases* are defensible or that their logic should be extended.  *See Fin. Oversight & Mgmt. Bd. v. Aurelius Inv. LLC*, 140 S. Ct. 1649, 1665 (2020).

### C.   UOCAVA and UMOVA cannot survive even rational basis review because they are arbitrary and irrational.

Not only do UOCAVA and UMOVA fail strict scrutiny and heightened scrutiny, as set out above, but they also fail rational basis review, because they draw distinctions between similarly situated citizens that are not rationally related to—and do not advance—*any* legitimate government interest.

### 1.   To satisfy rational basis review, a statute must advance some legitimate governmental purpose *today*.

A statute satisfies rational-basis review only if the disparate treatment "bears a rational relation to some legitimate end."  *Romer v. Evans*, 517 U.S. 620, 631 (1963).  Courts must "insist on knowing the relation between the classification adopted and the object to be attained," *id.* at 632, and must invalidate laws without

such a rational connection.  *See, e.g.*, *id.* (state constitutional amendment barring action to protect gays and lesbians invalid because it "lack[ed] a rational relationship to legitimate state interests"); *Cleburne*, 473 U.S. at 448 (permit denial for group home for intellectually disabled lacked "rational basis" in the "city's legitimate interests"); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 538 (1973) (statute defining food stamp eligibility was "wholly without any rational basis").

This standard is not "toothless."  *Mathews v. Lucas*, 427 U.S. 495, 510 (1976).  A law may fail that test if it "raise[s] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer*, 517 U.S. at 634.  And, consistent with the Court's recognition of the role of "new insights" in the equal protection analysis, *e.g.*, *Morales-Santana*, 137 S. Ct. at 1690, "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."  *Carolene Prods.*, 304 U.S. at 153; *cf. Shelby County v. Holder*, 570 U.S. 529, 556 (2013) ("'current burdens' must be justified by 'current needs'" (citation omitted)); *Dias v. City and County of Denver*, 567 F.3d 1169, 1183 (10th Cir. 2009) (changes may make a law "no longer rational").

## 2.   UOCAVA and UMOVA are unconstitutionally irrational.

Discrimination between former state residents who live in disfavored territories and those who live in foreign countries is not rational.  Discrimination

between those who live in the disfavored territories and those who live in favored territories like the NMI is even less so.

a.     There is no rational basis for withholding the same vote from former Hawaii residents in the territories that UOCAVA and UMOVA extend to former Hawaii residents who move to foreign countries.  The right to vote depends, in large part, on the relative interests of the groups denied the vote.  *See Cipriano*, 395 U.S. at 706 (restrictions may not constitutionally exclude "those who are as substantially affected and directly interested in the matter voted upon are as those who are permitted to vote"); *see id.* at 707 (Black & Stewart, JJ., concurring in the judgment) (statute would fail rational basis review); *Evans v. Cornman*, 398 U.S. at 426 (striking down voting restrictions because residents of federal enclave "ha[d] a stake equal to that of" state residents with vote).  And, if anything, former Hawaii residents in the territories have a *greater* interest in federal elections than those living in foreign countries.  Congress has broad authority over the territories that it lacks over U.S. citizens in foreign countries, and it has used that power to dictate law and policy to territorial residents for more than a century.  *See, e.g.*, *Aurelius*, 140 S. Ct. at 1659-61.

Despite these interests, neither the Congress that enacted UOCAVA nor the legislature that enacted UMOVA sought to justify the lines it drew to exclude those who move to disfavored territories.  To the contrary, UOCAVA sought to remedy

the "highly discriminatory" treatment then facing "private citizens outside the United States" who lost their right to vote for President and Vice President based on where they moved.  H.R. Rep. No. 94-649, pt. 1, at 2.  Such discrimination was "unacceptable as a matter of public policy, and . . . suspect under the equal protection clause."  *Id.*  At best, citizens who moved to the territories were excluded as an irrational oversight.  At worst, it was animus.

Contrary to the First and Second Circuits' view, the fact that territorial residents have no freestanding right to vote for President or voting representation in Congress does not justify UOCAVA and UMOVA's discriminatory regime.  *See Igartúa de la Rosa*, 32 F.3d at 10-11; *Romeu*, 265 F.3d at 125.  After all, former state residents who move to foreign countries have no such freestanding right either.  Further, the ability to vote for a single, non-voting Delegate or Resident Commissioner does not even resemble *equal* treatment.  *See, e.g.*, *Obergefell*, 576 U.S. at 675-76 (same- and opposite-sex marriage must be on "same terms").  And neither circuit even considered the differential treatment between citizens in disfavored territories and those in territories like the NMI, as discussed below.

**b.**     Even if it were rational to distinguish between those who move to disfavored territories and those who move abroad, there is no basis to distinguish between those who move to disfavored territories and those who move to the NMI and other territories.  Former state residents who move to the NMI get to vote for

President and voting representation in Congress by absentee ballot in Hawaii under

UOCAVA and UMOVA and can still vote for a nonvoting delegate from the NMI.

The Seventh Circuit disagreed in *Segovia*, reasoning that the NMI was

"more similar to foreign nations" than the other territories in 1979 when the

legislature enacted the relevant Illinois statute. *See* 880 F.3d at 390-91. That

reasoning is wrong on multiple levels.

*First*, courts must consider *present-day* circumstances even when assessing

hypothetical rationality. As noted, "[t]he constitutionality of a statute predicated

upon the existence of a particular state of facts" when it was enacted "may be

challenged by showing . . . those facts *have ceased to exist*." *Carolene Prods.*, 304

U.S. at 153 (emphasis added); *see also Leary v. United States*, 395 U.S. 6, 38 &

n.68 (1969) (court must "ascertain whether intervening years have witnessed

significant changes which might bear" on whether a law still has a rational basis);

*supra* p. 31. And there was no contention in *Segovia*—by either the court or the

government—that the state of affairs prevailing in 1979 persists today.

*Second*, even if the NMI were somehow more "foreign" in 1979, there is no

rational basis in the first place for treating citizens who move to foreign countries

differently from those who move to disfavored territories. *Supra* pp. 32-33.

*Finally*, the state of affairs in 1979 is irrelevant because UOCAVA became

law in 1986. The Covenant establishing political union between the Northern

Mariana Islands and the United States was by then ten years old, and people born there had been birthright U.S. citizens for eight years. *Sabangan v. Powell*, 375 F.3d 818, 819 (9th Cir. 2004). UMOVA was not passed until 2012.

In short, there is no conceivable rational basis, either today or when UOCAVA and UMOVA were passed, for denying the franchise to citizens who move to a few disfavored territories but extending it to those who move anywhere else. UOCAVA and UMOVA violate the equal protection guarantee regardless of the level of scrutiny the Court applies.

## II. The proper remedy is to sever UOCAVA and UMOVA so that they extend federal absentee voting rights to all former state residents living in foreign countries or U.S. territories.

The remedy for UOCAVA and UMOVA's discriminatory regime is to sever the statutes to extend federal absentee voting rights to *all* former state residents living overseas—whether in foreign countries or U.S. territories. This Court "must adopt the remedial course Congress likely would have chosen had it been apprised of the constitutional infirmity." *Morales-Santana*, 137 S. Ct. at 1701. And Congress's "intent, as revealed by the statute at hand," *id.* at 1699, was to remedy equal protection problems arising from discriminatory overseas voting laws.

**A.** As this Court explained, a court confronting an unconstitutional statute generally will try to sever those unconstitutional portions and leave the remainder intact. *Borja*, 2021 WL 4005990, at *10-11. Depending on legislative

intent, a court may "cure[] unequal treatment by, for example, extending a burden or nullifying a benefit" or by extending that benefit to others.  *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2354-56 (2020) ("*AAPC*") (citing *Morales-Santana*, 137 S. Ct. at 1701).  That is because "when the 'right invoked is that of equal treatment,' the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class."  *Heckler v. Mathews*, 465 U.S. 728, 740 (1984) (citation omitted).  Ultimately, "[t]he choice between these outcomes is governed by the legislature's intent, as revealed by the statute at hand"—*i.e.*, "'what the legislature would have willed had it been apprised of the constitutional infirmity.'" *Morales-Santana*, 137 S. Ct. at 1699 (quoting *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 427 (2010)).  Without an express severability clause, "a court should 'measure the intensity of commitment to the residual policy'—the main rule, not the exception—'and consider the degree of potential disruption of the statutory scheme that would occur by extension [of the benefit] as opposed to abrogation [of the statute].'" *Id.* at 1700 (cleaned up).

The usual result of that analysis is to extend favorable treatment.  *See id.* at 1701; *AAPC*, 140 S. Ct. at 2354 (plurality) ("preference for extension rather than nullification").  In a long line of cases, the Supreme Court has ordered public benefits to be extended to the disfavored group, rather than stripped from the

favored group. *See, e.g.*, *Califano v. Westcott*, 443 U.S. 76, 89, 93 (1979); *Jimenez v. Weinberger*, 417 U.S. 628, 637-38 (1974) (remanding case to allow previously disfavored group "to establish … eligibility … under the Social Security Act"); *Frontiero v. Richardson*, 411 U.S. 677, 691 n.25 (1973) (plurality) (invalidating statute that "require[d] a female [service] member to prove the dependency of her spouse" to obtain benefits for him). Plaintiffs are unaware of a single equal protection case involving voting rights where the remedy for an equal protection violation was to contract rather than expand those rights.

**B.   1.**   Here, Congress would have extended the vote to U.S. citizens who move to any U.S. territory rather than nullified the vote for citizens who move to foreign countries or favored territories like the NMI. The "main rule" and purpose of the statute, *Morales-Santana*, 137 S. Ct. at 1700, is to make absentee voting for President and voting members of Congress widely available for former state residents living overseas by enabling "overseas voters to use absentee registration procedures and to vote by absentee ballot," 52 U.S.C. § 20302(a)(1). Nullifying the vote overseas would leave no statute at all, much less Congress's "residual policy" of extending the vote. *Morales-Santana*, 137 S. Ct. at 1700.

The legislative history underscores the "intensity of [Congress's] commitment," *id.* (quoting *Heckler*, 465 U.S. at 739 n.5), to extending voting rights to remedy equal protection concerns. *See*, *e.g.*, S. Rep. No. 93-1016, at 1

(1974).  Congress enacted UOCAVA and its predecessor to expand voting rights to reduce the unfairness of allowing some former state residents, but not others, to vote.  *See, e.g.*, H.R. Rep. No. 94-649, pt. 1, at 1-3.  Responding to the inconsistent treatment of citizens in various state laws governing the eligibility of citizens residing overseas to vote in federal elections, Congress passed the OCVRA in 1975.  The House committee recognized "this treatment of private citizens outside the United States to be *highly discriminatory*" and considered "this discrimination . . . to be unacceptable as a matter of public policy, and to be *suspect under the equal protection clause of the 14th amendment*."  *Id.* at 3 (emphases added).  To remedy these problems, the OCVRA, and eventually UOCAVA, required states to provide absentee voting for eligible citizens residing outside the United States.  In other words, when apprised of possible equal protection concerns associated with treating overseas citizens differently in terms of federal absentee voting rights, Congress uniformly chose to expand the right to vote rather than restrict it.

Consistent with UOCAVA's main rule, which reflects Congress's clear intent to remedy equal protection issues by extending the vote, and Hawaii's clear intent to follow Congress's lead, this Court should sever UOCAVA and UMOVA's discriminatory exclusion of U.S. citizens who move to Guam, Puerto Rico, the U.S. Virgin Islands, and American Samoa.  Severing the statutes to reach

former state residents who move to those territories advances Congress's purpose by extending UOCAVA's main rule; denying it to U.S. citizens who moved abroad or to favored territories like the NMI would undermine it.

Moreover, the right to vote (unlike rights to public benefits, for example) is "fundamental" because it is "preservative of all rights." *Yick Wo*, 118 U.S. at 370; *see supra* pp. 12-17. It "is foundational in our democratic system." *Davis v. Guam*, 932 F.3d 822, 830 (9th Cir. 2019). Extension of the voting rights in UOCAVA and UMOVA reflects that insight, which is the very basis for the statutes themselves. Withdrawal of voting rights, in contrast, would reject it.

2.      As this Court has already explained, the mechanics of severability here are straightforward. *See Borja*, 2021 WL 4005990, at *9-11. Consistent with what Congress would have done had it been apprised of the constitutional infirmity, the Court should strike and order unenforceable the inclusion of "the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa" in UOCAVA's definition of "United States," 52 U.S.C. § 20310(8), and "Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States" in the definition of "United States" in UMOVA, H.R.S. § 15D-2.

3.      Defendants' likely counterarguments are unpersuasive. *First*, Defendants may contend that Congress would have withdrawn the vote from

former state residents who moved to the NMI and other favored territories rather than extended it to all U.S. territories.  But Congress's intense commitment to the main rule, as discussed above, proves just the opposite. More importantly, Congress would not have been permitted to simply withdraw the vote from NMI residents, because UOCAVA would still violate equal protection by extending the vote to former state residents who moved to foreign countries but not those who moved to U.S. territories.  And Congress would not have wanted to withdraw voting rights from U.S. citizens who moved to foreign countries—after all, Congress enacted the statute precisely to extend rights to those individuals.

*Second*, Defendants may argue that the Supreme Court severed the statute in *Morales-Santana* so as to contract rights.  But *Morales-Santana* highlights why extension is the right result here.  *Morales-Santana* was "hardly the typical case," because there "the general rule," which Congress would have preferred to preserve, was a more rigorous requirement for parents to transmit citizenship to children born abroad.  137 S. Ct. at 1699-1701.  The more favorable rule was the limited exception.  *Id.*  And the Court specifically contrasted that atypical case from the usual case in which—as here—Congress would prefer the general rule—the very conferral of the benefit itself.  *Id.* at 1699.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment.

40

Dated: November 22, 2021, at Honolulu, Hawaii

Respectfully submitted,

/s/*Anthony "T.J." Quan*
_____
ANTHONY "T.J." QUAN
GEOFFREY M. WYATT
(*Pro Hac Vice*)
SHAY DVORETZKY
(*Pro Hac Vice*)
NICOLE M. CLEMINSHAW
(*Pro Hac Vice*)
ANDREW C. HANSON
(*Pro Hac Vice*)
ZACHARY W. MARTIN
(*Pro Hac Vice*)
PARKER RIDER-LONGMAID
(*Pro Hac Vice*)
VANESSA WILLIAMS
 (*Pro Hac Vice*)
PAMELA COLON
 (*Pro Hac Vice*)
NEIL C. WEARE
 (*Pro Hac Vice*)
*Attorneys for Plaintiffs*

41