IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| VICENTE TOPASNA BORJA, et al., | CIVIL NO. 20-00433 JAO-RT |
| Plaintiffs, | ORDER (1) GRANTING DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND (2) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| SCOTT NAGO, in his official capacity as Chief Election Officer for the Hawaii Office of Elections, et al., | |
| Defendants. | |

**ORDER (1) GRANTING DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND (2) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Vicente Topasna Borja ("Borja"), Edmund Frederick Schroeder, Jr. ("Schroeder"), Ravinder Singh Nagi ("R. Nagi"), Patricia Arroyo Rodriguez ("Rodriguez"), Laura Castillo Nagi ("L. Nagi"), and Equally American Legal and Defense and Education Fund ("Equally American") (collectively, "Plaintiffs") challenge the constitutionality of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), codified at 52 U.S.C. §§ 20301 to 20311, Hawaii's Uniform Military and Overseas Voters Act ("UMOVA"), codified at Hawai'i Revised Statutes ("HRS") §§ 15D-1 to -18, and Hawai'i Administrative Rules ("HAR") § 3-177-600. Although this case broadly implicates voting rights, the

narrow issue before the Court is whether UOCAVA and UMOVA violate the Equal Protection Clause by declining to extend the right to vote absentee in federal elections to Plaintiffs, who are former Hawaiʻi residents now residing in Guam and the U.S. Virgin Islands ("Virgin Islands").

The parties cross move for summary judgment, with Plaintiffs arguing that UOCAVA and UMOVA are unconstitutional, and Defendants United States of America, Lloyd J. Austin, III, Federal Voting Assistance Program, David Beirne,[1] Scott Nago ("Nago"), and Glen Takahashi ("Takahashi")[2] (collectively, "Defendants") arguing that UOCAVA and UMOVA survive rational basis review. For the following reasons, the Court GRANTS Defendants' cross-motions for summary judgment and joinder, ECF Nos. 140, 142, 144, and DENIES Plaintiffs' Motion for Summary Judgment.  ECF No. 137.  The Court rejects Plaintiffs' argument that the statutes are unconstitutional merely because they do not grant Plaintiffs a right given to others, particularly when Plaintiffs' fellow territorial residents lack such a right.

---

[1]  These defendants are collectively referred to as the "Federal Defendants."

[2]  Nago and Takahashi are collectively referred to as the "Hawaiʻi Defendants."

## BACKGROUND

**A.     Factual History**

**1.     Plaintiffs**

Plaintiffs — all former Hawai'i residents[3] — allege that UOCAVA, UMOVA, and HAR § 3-177-600 preclude them from voting in Hawai'i by absentee ballot for President and Hawaii's U.S. congressional delegation because they currently reside in Guam or the Virgin Islands.  ECF No. 105 ¶¶ 1–2, 14–20.

Borja, a U.S. citizen born in Guam, was a Hawai'i resident in 1990.  ECF No. 138-2 ¶¶ 1, 3, 7; ECF No. 105 ¶ 15.a.  He currently resides in Guam.  ECF No. 138-2 ¶ 1.  Schroeder is a U.S. citizen who was born in North Carolina.  ECF No. 138-4 ¶¶ 1, 3.  He lived in Hawai'i from 1976 to 1984, then moved to Guam, where he currently resides.  *Id.* ¶¶ 1, 5–7.  R. Nagi, a U.S. citizen born in Guam, currently resides in the Virgin Islands.  ECF No. 138-5 ¶ 1.  He resided in Hawai'i from 2002 to 2005.  *Id.* ¶¶ 3–4.  Rodriguez is a U.S. citizen who was born in Texas.  ECF No. 138-6 ¶ 1.  She lived in Hawai'i from 1978 to 1994 and currently resides in Guam.  *Id.* ¶¶ 1, 3.  A U.S. citizen born in Illinois, L. Nagi was a resident of Hawai'i from 2002 to 2005.  ECF No. 138-7 ¶¶ 1, 3, 5.  She currently lives in the Virgin Islands.  *Id.* ¶ 1.  Equally American has members, including Borja,

---

[3]  Or, in the case of Equally American, has members, who are former Hawai'i residents.  ECF No. 105 ¶ 20.

Schroeder, R. Nagi, Rodriguez, and L. Nagi (collectively, the "Individual Plaintiffs"), who reside in Guam, the Virgin Islands, Puerto Rico, American Samoa, and the Northern Mariana Islands ("NMI"), and formerly resided in a state. ECF No. 138-8 ¶ 7.

### 2.    UOCAVA, UMOVA, And HAR § 3-177-600

Enacted in 1986, UOCAVA's purpose was to "facilitate absentee voting by United States citizens, both military and civilian, who are overseas."  H.R. Rep. No. 99-765, at 5 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2009, 2009.  Overseas voters include absent uniformed services voters and those residing outside the United States who (1) are qualified to vote in the place they were last domiciled before leaving the United States and (2) who would be qualified to vote in the place last domiciled before leaving the United States but for their current residence outside the United States.  *See* 52 U.S.C. § 20310(5)(B)–(C).  "States" and the territorial use of "United States" include a state of the United States, the District of Columbia, Puerto Rico, Guam, the Virgin Islands, and American Samoa.  *See* 52 U.S.C. § 20310(6) & (8).  The NMI is excluded from these definitions.  *See id*.

UMOVA authorizes U.S. citizens who are former Hawaiʻi residents and living outside the United States to vote by absentee ballot in federal elections. HRS § 15D-1 to -18.  Its purpose was "to ensure the ability of members of the military and other[] eligible voters who are overseas to participate in all elections

for federal, state, and local offices." ECF No. 143-4 at 1; S. Stand. Comm. Rep. No. 2450, https://www.capitol.hawaii.gov/session2012/commreports/HB461_SD1 _SSCR2450_.HTM. UMOVA defines "United States" as "the several states, the District of Columbia, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States." HRS § 15D-2. While UMOVA does not itself distinguish between the NMI and other territories, through administrative rules, Hawai'i allows former Hawai'i citizens now residing in the NMI to vote absentee in federal elections like overseas voters by authorizing the issuance of ballot packages to voters covered by UOCAVA. *See* HAR § 3-177-600. Because UOCAVA excludes the NMI from the definition of "states" and territorial use of "United States," *see* 52 U.S.C. § 20310(6) & (8), U.S. citizens residing in the NMI are treated as overseas voters and therefore able to vote absentee. *See* HAR § 3-177-600. UMOVA additionally permits absentee voting by U.S. citizens born outside the United States who have never resided in the United States or registered to vote in any state, if their parents or guardians last resided in Hawai'i and would have been eligible to vote in Hawai'i before moving overseas. *See* HRS § 15D-2. As a result, certain U.S. citizens who have never resided in the United States can vote in Hawaii's federal elections while former Hawai'i residents lose the right to participate in such

elections if they move to Guam, the Virgin Islands, American Samoa, or Puerto Rico.  *See id.*

Plaintiffs challenge the distinction in UOCAVA, UMOVA, and HAR § 3-177-600 between U.S. citizens residing in the NMI or in a foreign country, with those residing in Guam, the Virgin Islands, American Samoa, or Puerto Rico.  ECF No. 105 ¶¶ 2, 51, 62.  Because Plaintiffs reside in Guam and the Virgin Islands, they are unable to vote for President or members of Congress.  ECF No. 138-2 ¶ 9; ECF No. 138-4 ¶ 11; ECF No. 138-5 ¶ 14; ECF No. 138-6 ¶ 10; ECF No. 138-7 ¶ 9.

### 3.     Stipulated Facts

The parties stipulate that the Individual Plaintiffs:  are not current Hawaiʻi residents; are not currently registered to vote in Hawaiʻi; did not apply to register to vote absentee nor request an absentee ballot pursuant to UOCAVA or UMOVA; are not "overseas voters" or "covered voters" as defined by HRS § 15D-2; are not "absent uniformed services voters" or "overseas voters" as defined by 52 U.S.C. § 20310(1) and (5); seek to vote absentee in presidential and congressional elections in Hawaiʻi; and do not seek to vote absentee in state or local elections in Hawaiʻi.  ECF No. 136 ¶¶ 1–8, 14–15.  Borja, Schroeder, and Rodriguez are registered to vote in Guam.  *Id.* ¶¶ 9–10, 12.  R. Nagi and L. Nagi are registered to vote in the Virgin Islands.  *Id.* ¶¶ 11, 13.

### 4.   Procedural History

Plaintiffs commenced this action on October 8, 2020.  On October 29, 2020, they filed an Amended Complaint.  ECF No. 39.  Pursuant to the Stipulation Permitting Leave to Plaintiffs to File Second Amended Complaint and Order, *see* ECF No. 72, Plaintiffs filed a Second Amended Complaint ("SAC") on December 18, 2020.  ECF No. 73.

On January 14, 2021, the Federal Defendants filed a Motion to Dismiss for Lack of Subject-Matter Jurisdiction, *see* ECF No. 74, and were joined in part by the Hawaiʻi Defendants.[4]  ECF Nos. 78–80.  The Court issued an Order Granting Federal Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction ("Dismissal Order"), concluding that Plaintiffs established an injury in fact and traceability but not redressability, and gave Plaintiffs leave to amend.  ECF No. 102; *see also Reeves v. Nago*, __ F. Supp. 3d__, 2021 WL 1602397 (D. Haw. Apr. 23, 2021).

On May 14, 2021, Plaintiffs filed a Third Amended Complaint ("TAC").  ECF No. 105.  The TAC asserts a single 42 U.S.C. § 1983 claim — UOCAVA and UMOVA violate the Equal Protection and Due Process Clauses of the Fifth and

---

[4]  At the time, the Hawaiʻi Defendants also included Kathy Kaohu, but she was later dismissed.  ECF No. 106.

Fourteenth Amendments[5] by protecting the voting rights of certain former Hawaiʻi residents based on whether they live overseas or in specified territories. *Id.* at 40.

Plaintiffs pray for:  (1) an order (a) declaring that UOCAVA, UMOVA, and HAR § 3-177-600 violate the Fifth Amendment, the Fourteenth Amendment, and § 1983 by allowing former Hawaiʻi residents living in foreign countries or the NMI to vote absentee while disallowing those living in Puerto Rico, Guam, the Virgin Islands, or American Samoa from doing so, (b) striking and ordering unenforceable the inclusion of the "the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa" in UOCAVA's definition of "United States," and (c) striking and ordering unenforceable the inclusion of "Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States" in UMOVA's definition of "United States"; (2) a preliminary and permanent order enjoining the enforcement of UOCAVA, UMOVA, and HAR § 3-177-600 in a manner that violates the Fifth or Fourteenth

---

[5]  Plaintiffs again allege a violation of 42 U.S.C. § 1983 but "one cannot go into court and claim a 'violation of § 1983' — for § 1983 by itself does not protect anyone against anything."  *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 978 (9th Cir. 2004) (some internal quotation marks and citation omitted).  This is because § 1983 "does not create any substantive rights; rather it is the vehicle whereby plaintiffs can challenge actions by governmental officials."  *Id.* (internal quotation marks and citation omitted).  Therefore, the Court will treat Plaintiffs' claim as alleging violations of the Fifth and Fourteenth Amendments.

Amendments or § 1983; (3) attorneys' fees and costs; and (4) further just and appropriate relief. *Id.* at 42–44.

On June 14, 2021, Defendants again sought dismissal for lack of subject matter jurisdiction. ECF Nos. 107, 109–110. The Court denied the request. ECF No. 128; *Borja v. Nago*, CIVIL NO. 20-00433 JAO-RT, 2021 WL 4005990 (D. Haw. Sept. 2, 2021). It found that Plaintiffs had standing because they met the injury in fact, traceability, and redressability requirements. *See Borja*, 2021 WL 4005990, at *4–11.

On November 22, 2021, Plaintiffs filed the present Motion for Summary Judgment. ECF No. 137. The Federal Defendants and Nago responded with oppositions and cross-motions for summary judgment. ECF Nos. 140, 142. Takahashi joined in the foregoing. ECF No. 144. On January 21, 2022, Plaintiffs filed a Combined Reply in Support of their Motion for Summary Judgment and Opposition to Defendants' Cross-Motions for Summary Judgment. ECF No. 151. On February 11, 2022, Nago, joined by Takahashi, filed a Reply. ECF Nos. 154–55. The Federal Defendants filed also filed a Reply the same day. ECF No. 156.

On March 10, 2022, the Court stayed the case pending the resolution of *United States v. Vaello Madero*, 596 U.S. __, 142 S. Ct. 1539 (2022). ECF No. 163. The stay was lifted in April and the parties filed supplemental briefing

regarding the impact of *Vaello Madero* on their arguments.  ECF Nos. 165, 166, 168–70.

The Court held a hearing on the pending motions on August 12, 2022.  ECF No. 178.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  "A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  In a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party.  *See State Farm Fire & Cas. Co. v. Martin*, 872 F.2d 319, 320 (9th Cir. 1989) (per curiam).

Once the moving party has met its burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See T.W. Elec.*, 809 F.2d at 630; Fed. R. Civ. P. 56(c).  The opposing party may not defeat a motion for

summary judgment in the absence of any significant probative evidence tending to support its legal theory.  *See Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The nonmoving party cannot stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial.  *See T.W. Elec.*, 809 F.2d at 630; *Blue Ocean Pres. Soc'y v. Watkins*, 754 F. Supp. 1450, 1455 (D. Haw. 1991) (citing *id.*).

If the nonmoving party fails to assert specific facts beyond the mere allegations or denials in its response, summary judgment, if appropriate, shall be entered.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990); Fed. R. Civ. P. 56(e).  There is no genuine issue of fact if the opposing party fails to offer evidence sufficient to establish the existence of an element essential to that party's case.  *See Celotex*, 477 U.S. at 322; *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994) (citing *id.*); *Blue Ocean*, 754 F. Supp. at 1455 (same).

In considering a motion for summary judgment, "the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence."  *T.W. Elec.*, 809 F.2d at 631 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)) (footnote omitted).  Inferences must be drawn in favor of the nonmoving party.  *See id.*  However, when the opposing party offers no direct evidence of a

material fact, inferences may be drawn only if they are reasonable in light of the other undisputed background or contextual facts and if they are permissible under the governing substantive law.  *See id.* at 631–32.  If the factual context makes the opposing party's claim implausible, that party must come forward with more persuasive evidence than otherwise necessary to show there is a genuine issue for trial.  *See Bator v. Hawaii*, 39 F.3d 1021, 1026 (9th Cir. 1994) (citing *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987)).

## DISCUSSION

Plaintiffs argue that UOCAVA and UMOVA violate their equal protection rights by denying them the right to vote for President of the United States and representation in Congress merely because they live outside the 50 states, while protecting the voting rights of U.S. citizens who live overseas or in the NMI.  ECF No. 137-1 at 19–20.  Plaintiffs postulate that UOCAVA and UMOVA are subject to strict scrutiny but cannot even satisfy heightened scrutiny or rational basis review because these statutes discriminate against a quasi-suspect class and do not advance any legitimate interest.  *Id.*

The Federal Defendants contend that rational basis review applies because (1) no fundamental rights are restricted given that territorial residents do not have a fundamental right to vote in federal elections and (2) territorial residents — more

specifically, former Hawaiʻi residents who moved to particular territories — are not a protected class.  ECF No. 140-1 at 22–23, 29–30.  And under such review, UOCAVA rationally distinguishes between U.S. citizens who reside out of the country from those who reside in the subject territories.  *Id.* at 32–45.

The Hawaiʻi Defendants argue that no scrutiny applies to UMOVA but that if scrutiny applies, it should be rational basis review, which UMOVA survives. ECF No. 142-1 at 12–26; ECF No. 144.

## A.    Equal Protection

The Equal Protection Clause mandates "that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted).  To prevail on an equal protection claim, Plaintiffs must show disparate treatment of a similarly situated class.  *See Boardman v. Inslee*, 978 F.3d 1092, 1117 (9th Cir. 2020) (citation omitted).  Plaintiffs urge the Court to apply strict scrutiny and find UOCAVA, UMOVA, and HAR § 3-177-600 unconstitutional.  Three levels of scrutiny are at issue when a law is alleged to violate equal protection rights:  "strict scrutiny, intermediate scrutiny, or rational basis review."  *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277 (9th Cir. 2004) (citation omitted).  "Strict scrutiny is applied when the classification is made on 'suspect' grounds such as race, ancestry, alienage, or categorizations impinging upon fundamental rights such as privacy, marriage, voting, travel, and freedom of

association." *Id.* (citation omitted); *see Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (per curiam) (holding that strict scrutiny of a legislative classification in the equal protection context is required "only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class" (footnotes omitted)).  When laws discriminate based on other suspect classifications, such as gender, they are subject to intermediate scrutiny.  *See Kahawaiolaa*, 386 F.3d at 1277 (citation omitted). Finally, if a law does not involve a suspect class or burden a fundamental right, rational basis review applies.  *See id.* at 1277–78 (citation omitted).

### 1.    Strict Scrutiny And Intermediate Scrutiny Are Inapplicable

#### a.    Right To Vote

Plaintiffs frame the subject violation of equal protection rights as an infringement on the fundamental right to vote.  Although the statutes at issue affect the right to vote, they do not infringe upon the right to vote.  *See Igartua De La Rosa v. United States*, 32 F.3d 8, 10 n.2 (1st Cir. 1994) ("*Igartua I*") (per curiam) (stating that UOCAVA "does not infringe [the] right [to vote] but rather limits a state's ability to restrict it").  Territorial residents have no right to vote in federal elections and U.S. citizens who move to certain territories likewise have no right to vote absentee in their former states of residence.

### i.   Territorial Residents Do Not Have A Fundamental Right To Vote In Federal Elections

It is well established that territorial residents do not have a right to vote in federal elections.  In accordance with Article II of the U.S. Constitution, electors, not citizens, elect the President and Vice President.  *See Att'y Gen. of the Territory of Guam v. United States*, 738 F.2d 1017, 1019 (9th Cir. 1984) (citations omitted); U.S. Const. art. II, § 1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress[.]").  Thus, "[t]he right to vote in presidential elections under Article II inheres not in citizens but in states:  citizens vote indirectly for the President by voting for state electors," *Att'y Gen. of Guam*, 738 F.2d at 1019, and "no U.S. citizen, whether residing in a State or territory or elsewhere, has an expressly declared constitutional right to vote for electors in presidential elections." *Romeu v. Cohen*, 265 F.3d 118, 123 (2d Cir. 2001) (citation omitted).  Because territories are not states,[6] they have no electors, and their residents consequently "cannot

---

[6]  Significantly, the Supreme Court recently reaffirmed Congress's broad authority to legislate differently between U.S. territories and the states pursuant to the Territory Clause of the Constitution, which permits Congress to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States." *Vaello Madero*, 596 U.S. at __, 142 S. Ct. at 1541 (quoting U.S. Const. art. IV, § 3, cl. 2 (alteration in original) (internal quotation marks omitted)).  This "longstanding congressional practice reflects both national and local

(continued . . .)

exercise individual votes in a presidential election." *Att'y Gen. of Guam*, 738 F.2d at 1019; *see also Igartúa v. United States*, 626 F.3d 592, 601–02 & n.9 (1st Cir. 2010) (holding that the right to elect Representatives to the House of Representatives "is given to residents of the States, not to citizens," and that voting rights are conferred upon "citizens 'of the several States'").  Simply put, "the residents of the territories have no fundamental right to vote in federal elections." *Segovia v. United States*, 880 F.3d 384, 390 (7th Cir. 2018);[7] *see Romeu*, 265 F.3d at 123 ("[A]ll U.S. citizens living in U.S. territories . . . possess more limited voting rights than U.S. citizens living in a State.").

### ii.   U.S. Citizens Have No Fundamental Right To Vote In Their Former States Of Residence

U.S. citizens who move to a territory or another state have no constitutional right to vote in their *former* states of residence, and Plaintiffs concede as much. ECF No. 137-1 at 28; *see also Segovia*, 880 F.3d at 390 ("The unmistakable conclusion is that, absent a constitutional amendment, only residents of the 50

---

(continued . . .)
considerations" including "policy judgments that account not only for the needs of the United States as a whole but also for (among other things) the unique histories, economic conditions, social circumstances, independent policy views, and relative autonomy of the individual Territories."  *Id.*

[7]  The Court previously declined to adopt the Seventh Circuit's standing analysis but finds persuasive its equal protection analysis.

States have the right to vote in federal elections.  The plaintiffs have no special right simply because they *used to* live in a State."); *Igartua I*, 32 F.3d at 10 (holding that UOCAVA's distinction between "those who reside overseas and those who move anywhere within the United States" does not affect a fundamental right); *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) ("It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots.").  The Supreme Court "has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens *in the jurisdiction*."  *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (emphasis added) (collecting cases); *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68–69 (1978) ("No decision of this Court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions.  On the contrary, our cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." (citations omitted)).  It bears emphasis that Plaintiffs effectively assert a constitutional right to vote in Hawai'i, even though they left, in most cases, decades ago.  As much as Plaintiffs wish to retain *former* voting rights, they are no longer Hawai'i residents, and territorial residents do not have the right

to vote in federal elections, so UOCAVA and UMOVA do not treat Plaintiffs differently than others in their respective jurisdictions.

Plaintiffs' talking points address general voting rights principles and, while those are important, they have no bearing on the circumstances here.  For example, Plaintiffs argue that "strict scrutiny is especially important when the individuals selectively denied the right to vote for government officials are subject to that government's power."  ECF No. 137-1 at 27.  However, *Evans v. Cornman*, 398 U.S. 419 (1970), which they cite, concerned the denial of voting rights to Maryland residents living in a federal enclave.  *See id.* at 419–20.  In other words, people *within a single state* were being treated differently.  The Supreme Court held that it was a violation of equal protection rights to exclude the enclave residents from voting because they had a stake in electoral decisions equal to other Maryland residents and were treated by the state as residents to a significant degree.  *See id.* at 423–26.  As already mentioned, territorial residents have no right to vote in federal elections even though they are affected by federal law.  The Court accordingly rejects Plaintiffs' assertion that strict scrutiny must apply given that they are governed by federal law and are treated as U.S. residents for most purposes in the application of federal law.  ECF No. 151 at 14.  Moreover,

Plaintiffs have no stake in electoral decisions affecting Hawaiʻi residents, nor does Hawaiʻi treat them as residents.[8]

Plaintiffs also contend that the government is prohibited from discriminating among former state residents once voting rights have been extended.  ECF No. 137-1 at 28.  Plaintiffs cite no cases for the proposition that a former state resident has a fundamental right to vote in that state, however.  They instead rely on cases involving disparate treatment in the voting context *within a single geographical jurisdiction*, and Plaintiffs' counsel conceded this at the hearing.  *See*, *e.g.*, *Charfauros v. Bd. of Elections*, 249 F.3d 941, 952 (9th Cir. 2001) (finding unconstitutional the administration of pre-election day voter challenge procedures that precluded a certain class of voters from voting in an election on Rota Island in the NMI).  This is a key distinction that Plaintiffs ignore.  *See*, *e.g.*, *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (identifying the two types of voting regulations subjected to strict scrutiny by the Supreme Court:  those "that unreasonably deprive some residents in a geographically defined governmental unit from voting in a unit wide election" and those "that contravene the principle of 'one person, one vote' by diluting the voting power of some qualified voters within

---

[8]  The Court is aware that Plaintiffs only wish to vote absentee in Hawaiʻi in federal elections, not state or local elections, *see* ECF No. 136 ¶¶ 14–15, but the Court makes this point because Hawaiʻi is the jurisdiction in which they claim an entitlement to vote.

the electoral unit" (some internal quotation marks and citations omitted)); *Green v. City of Tucson*, 340 F.3d 891, 900 (9th Cir. 2003) (explaining that the types of voting restrictions subject to strict scrutiny concern "the equal treatment of voters within the governmental unit holding the election, be it a school district, a city or a state" (citations omitted)).

Plaintiffs attempt to define the relevant governmental or electoral "unit" as "former state residents who do not obtain the right to vote in their new homes." ECF No. 151 at 15.  But the governmental/electoral unit is Hawaiʻi, and they are not part of that unit, so they are not deprived of any voting rights simply because the right to vote in federal elections has not been *extended* to them, as it has to those in foreign countries and the NMI.  Indeed, Plaintiffs mischaracterize the lack of an extension of the right to vote absentee in federal elections as a wholesale exclusion from that right, *see id.*, even though anyone who moves from a state to another state or a territory other than the NMI is similarly denied an extension of that right.

Where, as here, voting rights have been extended to some, strict scrutiny is not required just because Plaintiffs are not among those who benefit.  A "statute is not invalid under the Constitution because it might have gone farther than it did." *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) (internal quotations marks and citation omitted); *McDonald*, 394 U.S. at 809 ("[A] legislature traditionally has

20

been allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,'" and "a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked." (citations omitted)).  Plaintiffs criticize Defendants' reliance on *Katzenbach v. Morgan* for the broad rule that no statute seeking to expand the franchise can be subject to strict scrutiny.  ECF No. 151 at 17.  However, Defendants limit *Katzenbach*'s application to the statutes at issue here.  ECF No. 140-1 at 27– 28; ECF No. 142-1 at 21–22.  Despite Plaintiffs' mischaracterization of this case as involving the denial of voting rights, the issue is whether Congress and/or Hawaiʻi violated the Constitution by not extending absentee voting rights to Plaintiffs.

Relevant here, *Katzenbach* addressed a complaint that "Congress violated the Constitution by not extending the relief effected in § 4(e) [of the Voting Rights Act of 1965] to those educated in non-American-flag schools."  *Katzenbach*, 384 U.S. at 643, 656–57.  Section 4(e) provided "that no person who has successfully completed the sixth primary grade in a public school in, or a private school accredited by, the Commonwealth of Puerto Rico in which the language of instruction was other than English shall be denied the right to vote in any election because of his inability to read or write English."  *Id.* at 643.  It prohibited the

enforcement of an English literacy requirement "for those educated in American-flag schools (schools located within United States jurisdiction) in which the language of instruction was other than English, and not for those educated in schools beyond the territorial limits of the United States in which the language of instruction was also other than English." *Id.* at 656.

The Supreme Court reasoned that because § 4(e) did "not restrict or deny the franchise but in effect extend[ed] the franchise to persons who otherwise would be denied it by state law," it was unnecessary to "decide whether a state literacy law conditioning the right to vote on achieving a certain level of education in an American-flag school (regardless of the language of instruction) discriminate[d] invidiously against those educated in non-American-flag schools." *Id.* at 657.  In deciding the relevant issue — "whether the challenged limitation on the relief effected in § 4(e) was permissible" — the Supreme Court found strict scrutiny inapplicable because the challenged distinction was "presented only as a limitation on a reform measure aimed at eliminating an existing barrier to the exercise of the franchise." *Id.*  The Supreme Court was guided by the principles that (1) a "statute is not invalid under the Constitution because it might have gone farther than it did"; (2) "a legislature need not strike at all evils at the same time"; and (3) "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Id.* (internal quotation marks and

citations omitted).  Like *Katzenbach*, this case is about the constitutionality of the extension of the right to vote to those who would otherwise lose the right.  *See id.*; *see also McDonald*, 394 U.S. at 807–08 (applying rational basis review and upholding absentee voting statutes, which were "designed to make voting more available to some groups who cannot easily get to the polls" and did not deny the exercise of the right to vote).

Finally, Plaintiffs argue that strict scrutiny applies to voting in the territories. ECF No. 137-1 at 28.  That territorial residents have constitutionally protected voting rights does not promote Plaintiffs' desired application of strict scrutiny, as they are registered voters in their respective territories, and their territorial voting rights are not at issue.  ECF No. 136 ¶¶ 9–13.  Plaintiffs instead seek absentee voting rights in Hawaiʻi to participate in federal elections, which would be *superior* to those conferred upon their fellow territorial residents and frankly could result in a far more serious equal protection problem than what is alleged here.  *See infra* Part A.2.a.

For these reasons, no fundamental right mandating the application of strict scrutiny is affected.

### b.   Plaintiffs Are Not Members Of A Suspect Or Quasi-Suspect Class

Plaintiffs alternatively argue that at least heightened scrutiny applies because territorial residents are members of a quasi-suspect class, described by Plaintiffs as

"a discrete and insular minority of U.S. citizens who have been excluded from participating in the political system for over a century."  ECF No. 137-1 at 35–39.  But this case does not concern territorial residents as a whole; it concerns U.S. citizens who move from Hawaiʻi to certain territories.  Even if territorial residents in general were the subject of this litigation, as explained above, it is settled law that the inability of territorial residents to vote in federal elections is not unconstitutional.  And while Plaintiffs repeatedly protest that their "disfavored" territories are singled out, they disregard the fact that UOCAVA, UMOVA, and HAR § 3-177-600 treat their territories the same as all states and the District of Columbia.  Therefore, Plaintiffs' irrelevant arguments about the historic disenfranchisement of territorial residents are unavailing.  The Individual Plaintiffs are all former Hawaiʻi residents who moved to Guam or the Virgin Islands, and members of Equally American are former state residents who currently reside in these territories plus Puerto Rico, American Samoa, and the NMI.  The federal voting rights sought by Plaintiffs would confer no general benefit upon the territorial residents whose history they impute to themselves/adopt as their own, unless those residents previously lived in Hawaiʻi.

The salient question is whether former Hawaiʻi residents who move to a territory other than the NMI constitute a quasi-suspect class.  Plaintiffs have not

cited — and the Court has not found — any cases to support such a classification.[9] To the contrary, courts have concluded that plaintiffs who move from a state to a territory are not a suspect or quasi-suspect class. *See*, *e.g.*, *Segovia*, 880 F.3d at 390 (holding that the plaintiffs are not a suspect class because their "current condition is not immutable, as nothing is preventing them from moving back to Illinois" and "there has been no suggestion that the plaintiffs form a class of people historically subjected to unequal treatment," and doubting "that 'people who move from a State to a territory' even constitute a class of people recognized by the law"); *Igartua I*, 32 F.3d at 10 (finding that those "who previously voted in presidential elections while residing elsewhere" were not a suspect class).

---

[9]  The following factors are relevant to the determination of whether a classification is suspect or quasi-suspect and Plaintiffs apply them to argue that territorial residents are a quasi-suspect class:

> "A) whether the class has been historically subjected to discrimination; B) whether the class has a defining characteristic that frequently bears a relation to ability to perform or contribute to society; C) whether the class exhibits obvious, immutable or distinguishing characteristics that define them as a discrete group; and D) whether the class is a minority or politically powerless."

*Karnoski v. Trump*, 926 F.3d 1180, 1200 n.17 (9th Cir. 2019) (citation omitted). Applied to the proper "class," however, these factors do not support a finding that Plaintiffs constitute a quasi-suspect class.

Nor have Plaintiffs explained how a group of former Hawaiʻi residents wishing to vote absentee for President and Hawaii's U.S. congressional delegation could constitute a suspect or quasi-class.  The Court finds that they do not.

At issue then is not whether Plaintiffs' right to vote is compromised, or whether Plaintiffs constitute a quasi-suspect class, but whether UOCAVA and UMOVA's extension of voting rights to former Hawaiʻi residents who move to a foreign country and to the NMI — without extending the same rights to Plaintiffs — violates Plaintiffs' equal protection rights.  Because there is no infringement of a fundamental right or involvement of a suspect or quasi-suspect class, rational basis review applies.

### 2.    UOCAVA, UMOVA And HAR § 3-177-600 Survive Rational Basis Review

Under rational basis review, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *Cleburne*, 473 U.S. at 440; *see Boardman*, 978 F.3d at 1118 (stating that under the Equal Protection Clause, a statute "'need only rationally further a legitimate state purpose' to be valid" (some internal quotation marks and citations omitted)).  The party challenging the statute must "'negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record."  *Boardman*, 978 F.3d at 1118 (some internal quotation marks omitted) (quoting *Heller v. Doe*, 509 U.S. 312, 320–21

(1993)).  "[A] classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  *Heller*, 509 U.S. at 320 (citation omitted).  The Supreme Court rarely "strikes down a policy as illegitimate under rational basis scrutiny." *Trump v. Hawaii*, 585 U.S. __, 138 S. Ct. 2392, 2420 (2018).  On the limited occasions it has, "a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'"  *Id.* (alteration in original) (citation omitted).

Plaintiffs argue that their equal protection rights are violated because there is no rational basis for treating them differently than former Hawaiʻi residents who move to a foreign country or to the NMI.  ECF No. 137-1 at 42–46; ECF No. 151 at 21–29.  The Federal Defendants counter that UOCAVA is constitutional because (1) defining Guam, the Virgin Islands, Puerto Rico, and American Samoa as part of the "United States" places those who move from a state to one of those territories on equal footing with other residents of that territory; (2) the NMI can be treated differently than the other territories; (3) it is rational to treat former state residents who move to territories differently than those who move to foreign countries because the latter lose all voting rights; and (4) it is rational to treat individuals moving to uninhabited territories differently than those who move to

inhabited territories or the states.[10]  ECF No. 140-1 at 33–45.  The Hawaiʻi

Defendants contend that UMOVA's distinction between those who live in foreign

countries and those who move anywhere within the "United States" is rationally

related to its purpose of enabling those who are outside the "United States" to

participate in elections.  ECF No. 142-1 at 25.  Insofar as UMOVA easily survives

rational basis review, it is unnecessary to address the Hawaiʻi Defendants'

argument that no scrutiny applies.

> ### a.   It Is Rational To Define Guam, The Virgin Islands, Puerto Rico, And American Samoa As Part Of The "United States," While Excluding The NMI

The Federal Defendants explain that UOCAVA includes Guam, the Virgin

Islands, Puerto Rico, and American Samoa in its definition of "United States" to

place on equal footing state residents who move to one of those territories with

residents already there.  ECF No. 140-1 at 33–34.  Defendants submit that

extending absentee voting to all former state residents who move to any territory

would create a class of "super citizens" whose ability to vote in federal elections

— a right not given to territorial residents — would turn on prior residence in a

state.  *Id.* at 34; ECF No. 142-1 at 27 n.5.  Plaintiffs argue that Defendants have not

identified a legitimate government interest regarding the super citizen argument,

---

[10]  Plaintiffs did not respond to this last point and it is unnecessary to address it given the rational bases supporting the constitutionality of the statutes at issue.

especially because the NMI's exclusion from UOCAVA's definition of "United States" allows super citizens there.  ECF No. 151 at 23.  And they emphasize that the denial of voting rights to avoid uncomfortable questions about voting rights in the territories does not further a legitimate government interest.  *Id.* at 24.  This speculation falls well short of negating Defendants' proffered rationale.

Concern about the disparity that would result from the creation of super citizen territorial residents who could vote in federal elections is a plausible policy reason for treating the subject territories as part of the "United States."  *See Segovia*, 880 F.3d at 391 ("[W]e think it is significant that were we to require Illinois to grant overseas voting rights to all its former citizens living in the territories, it would facilitate a larger class of 'super citizens' of the territories."). The relationship of the subject classifications to the goal of avoiding super citizens "is not so attenuated as to render the distinction arbitrary or irrational."  *Boardman*, 978 F.3d at 1118 (internal quotation marks and citation omitted).

Relatedly, the creation of a "super citizen" group of territorial residents who previously lived in states and are now eligible to vote in federal elections could result in wealth-based inequity:

> [I]f the UOCAVA had done what plaintiff contends it should have done — namely, extended the vote in federal elections to U.S. citizens formerly citizens of a State now residing in Puerto Rico while not extending it to U.S. citizens residing in Puerto Rico who have never resided in a State — *the UOCAVA would have created a distinction of questionable*

> *fairness among Puerto Rican U.S. citizens, some of whom would be able to vote for President and others not, depending [on] whether they had previously resided in a State. The arguable unfairness and potential divisiveness of this distinction might be exacerbated by the fact that access to the vote might effectively turn on wealth.*

*Romeu*, 265 F.3d at 125 (emphasis added). The Court has already discussed the inability of territorial residents to vote in federal elections. Declining to extend absentee voting rights in federal elections to former Hawaiʻi residents — most of whom have not been residents for decades — to avoid conferring greater voting rights to them than their fellow territorial residents, is at least rational. Plaintiffs' continued efforts to transform this issue into one concerning territorial voting rights is misguided and ineffective. UOCAVA, UMOVA, and HAR § 3-177-600 do not address or affect the voting rights of territorial residents as a whole, so Plaintiffs' conjecture that their right to vote was denied to avoid uncomfortable questions about territorial voting rights does not cause the statutes to fail rational basis review. As the Court earlier clarified, this case is not about the denial or deprivation of the right to vote, but about whether a failure to extend voting rights that do not otherwise exist violates the Equal Protection Clause. The statutes are not unconstitutional merely because they do not grant Plaintiffs a right given to others, especially when Plaintiffs' fellow territorial residents lack such a right.

It is also rational for the NMI to be excluded from UOCAVA's definition of "United States," even though it creates a distinction between the NMI and the

"disfavored" territories.  Plaintiffs argue that there is no basis for this distinction because any justification that may have existed around the time UOCAVA was enacted is too attenuated or irrelevant today.  ECF No. 137-1 at 44–46; ECF No. 151 at 23–26.

The Federal Defendants correctly note that territories have historically been — and continue to be — treated differently from each other.  *Compare Rabang v. INS*, 35 F.3d 1449, 1454 (9th Cir. 1994) (holding that individuals born in the Philippines when it was a U.S. territory were not entitled to citizenship by birth because they were not born "in the United States" as contemplated by the Citizenship Clause of the Fourteenth Amendment (alteration in original)) *and Perdomo-Padilla v. Ashcroft*, 333 F.3d 964, 967 (9th Cir. 2003) (identifying residents of American Samoa as noncitizen nationals (citations omitted)), *with Att'y Gen. of Guam*, 738 F.2d at 1018 (noting that Guamanians are American citizens (citing 8 U.S.C. § 1407)); *see also* 42 U.S.C. § 619 (defining "State" as the 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, and American Samoa).  Therefore, an equal protection violation in this context does not result solely because of differences in treatment.

"[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.  A classification does not fail rational-basis review because it 'is not made with

mathematical nicety or because in practice it results in some inequality.'" *Heller*, 509 U.S. at 321 (some internal quotation marks and citation omitted). Governments have practical problems that "may justify, if they do not require, rough accommodations — illogical, it may be, and unscientific." *Id.* (internal quotation marks and citations omitted). Statutes need not be "perfectly calibrated in order to pass muster under the rational-basis test." *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 85 (1988) (citation omitted).

Plaintiffs make much of the fact that the only relevant inquiry is whether a statute serves a rational purpose *today*, not at the time it was enacted. ECF No. 151 at 22. They posit that the justifications for the NMI's differential treatment when UOCAVA was enacted no longer exist. However, the reasons offered by Defendants provide ample support today. It is conceivable that Congress viewed — and still views — the NMI as more analogous to a sovereign country than a territory due to its history. The fact that Congress could update UOCAVA to include the NMI in the definition of "United States" does not require it to do so for UOCAVA to pass constitutional muster. *See Heller*, 509 U.S. at 321; *Bankers Life*, 486 U.S. at 85.

The NMI, the newest territory,[11] has a unique historical and political relationship with the United States.  *See Northern Mariana Islands v. Atalig*, 723 F.2d 682, 684 (9th Cir. 1984).  The NMI was a part of the Trust Territory of the Pacific Islands, administered by the United States as a United Nations Trusteeship.  *See id.* (footnote and citation omitted).  "The United States exercise[d] powers of administration, legislation, and jurisdiction in the Trust Territory under the general supervision of the United Nations Security Council" but lacked sovereignty over the NMI.  *Id.* (citations omitted).  "After a period of transition, in 1986 the trusteeship terminated, and []NMI was fully launched."  *Mtoched v. Lynch*, 786 F.3d 1210, 1213 (9th Cir. 2015) (citation omitted).  When UOCAVA was passed, the NMI had not yet become a U.S. territory.  Even after becoming a territory, the NMI retained control over certain laws and did not enjoy some rights given to the "disfavored" territories.  *See*, *e.g.*, *Eche v. Holder*, 694 F.3d 1026, 1027 (9th Cir. 2012) (explaining that the NMI government "retained nearly exclusive control over immigration to the territory" until the Consolidated Natural Resources Act of 2008 took effect on November 28, 2009 (citations omitted)); 48 U.S.C. § 1806(a)(2) (identifying a transition period ending on December 31, 2029 for the NMI to

---

[11]  Spain ceded Puerto Rico and Guam to the United States as part of the Treaty of Paris following the Spanish-American War; the United States purchased the Virgin Islands in 1917; and American Samoa became a territory in 1900.  ECF No. 140-1 at 14.

implement the Immigration and Naturalization Act); 48 U.S.C. § 1751 (authorizing

representation of the NMI in Congress by a Resident Representative, who "shall be

a nonvoting Delegate to the House of Representatives").

Plaintiffs attempt to impose a requirement that the foregoing historical and

political justifications must "individually relate[] to overseas voting rights."  ECF

No. 151 at 25.  That is not what rational basis review requires, however.  It is

enough that the foregoing demonstrate a plausible policy reason for treating the

NMI differently than the "disfavored" territories, and they do.  *See Heller*, 509

U.S. at 319 ("[R]ational-basis review in [an] equal protection analysis 'is not a

license for courts to judge the wisdom, fairness, or logic of legislative choices.'"

(citations omitted)).  Accordingly, there is a rational basis for defining Guam, the

Virgin Islands, Puerto Rico, and American Samoa as part of the "United States,"

while excluding the NMI.

### b.    It Is Rational To Extend Absentee Voting Rights To Those Who Move To Foreign Countries

Plaintiffs also challenge UOCAVA's and UMOVA's distinction between

former state residents who move to territories and those who move to foreign

countries.  ECF No. 137-1 at 43–44; ECF No. 151 at  26–29.  Plaintiffs claim to

have a greater interest in federal elections than those who move abroad due to

Congress's broad authority over territories, and assert that former residents who

move to foreign countries, like territorial residents, have no freestanding right to

vote in federal elections.  ECF No. 137-1 at 43–44.  These arguments fail to negate the conceivable bases for treating those who move to foreign countries differently than those who move to territories.

"The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal."  *McDonald*, 394 U.S. at 809.  A legislature's "statutory classifications will be set aside only if no grounds can be conceived to justify them."  *Id.* (citations omitted).  The distinction between those who move to a foreign country and those who move elsewhere in the "United States" is more than justified here, and is related to the goal of preserving a right to vote that would otherwise be lost entirely.

First, as the First Circuit aptly pointed out, UOCAVA "does not distinguish between those who reside overseas and those who take up residence in [the "disfavored" territories], but between those who reside overseas and those who move anywhere within the United States."  *Igartua I*, 32 F.3d at 10.  Plaintiffs accuse UOCAVA of singling out and discriminating against former state residents who move to four territories (five under UMOVA), while extending the right to vote to those who move to nearly 200 countries.  ECF No. 151 at 26.  UOCAVA and UMOVA in fact treat Plaintiffs the same as former state residents who move to

another state or the District of Columbia, so the actual disparity is nothing close to Plaintiffs' dramatic portrayal. *See Romeu*, 265 F.3d at 125 ("[I]t is significant to note that in excluding citizens who move from a State to Puerto Rico from the statute's benefits, the UOCAVA treats them in the same manner as it treats citizens of a State who leave that State to establish residence in another State."). Viewed through the proper lens, it is difficult to find unconstitutional UOCAVA's and UMOVA's decision to treat Plaintiffs identically with former state residents who move to another state or the District of Columbia, even when compared with former state residents who move to foreign countries.

Second, without UOCAVA and UMOVA, former state residents who move to foreign countries — many of whom serve in the military — would ordinarily lose the right to vote in *any* election in the United States. *See id.* at 124–25. By contrast, former state residents who move to a territory can obtain voting rights in that territory, even if not in federal elections,[12] and those who move to another state can obtain voting rights there. *See Igartua I*, 32 F.3d at 10–11 (holding that Congress had a rational basis to protect the absentee voting rights of those who move to a foreign country because they could lose the right to vote in federal

---

[12]  As detailed above, the inability to vote in federal elections is not caused by UOCAVA or UMOVA; it is a consequence of constitutional limitations. *See Igartua I*, 32 F.3d at 11.

elections, while those who move anywhere within the "United States" can vote in their new places of residence); *Romeu*, 265 F.3d at 125 ("Congress thus extended voting rights in the prior place of residence to those U.S. citizens who by reason of their move outside the United States would otherwise have lacked any U.S. voting rights, without similarly extending such rights to U.S. citizens who, having moved to another political subdivision of the United States, possess voting rights in their new place of residence." (citations omitted)).

Finally, Plaintiffs' arguments do not undermine the rationality of UOCAVA and UMOVA articulated above. The fact that Plaintiffs may have a greater interest in federal elections than former state residents who move to a foreign country, or that the latter have no freestanding right to vote in federal elections, does not invalidate otherwise logical policy reasons supporting the distinctions made. This is true even when some inequality results. At bottom, Plaintiffs are upset that UOCAVA and UMOVA are not as expansive as they want. But for the multitude of reasons discussed herein, UOCAVA and UMOVA satisfy rational basis review and do not offend equal protection principles. *See Romeu*, 265 F.3d at 124 ("The distinction drawn by the UOCAVA between U.S. citizens moving from a State to a foreign country and U.S. citizens moving from a State to a U.S. territory is supported by strong considerations, and the statute is well tailored to serve these

considerations.").  Summary judgment is therefore GRANTED in Defendants'
favor and Plaintiffs' request for summary judgment is DENIED.

## CONCLUSION

For the reasons stated herein, the Court GRANTS Defendants' cross-
motions for summary judgment, *see* ECF Nos. 140, 142, as well as Takahashi's
Joinder, *see* ECF No. 144, and DENIES Plaintiffs' Motion for Summary Judgment.
ECF No. 137.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, September 6, 2022.



Jill A. Otake
United States District Judge

Civil No. 20-00433 JAO-RT; *Borja, et al. v. Nago, et al.*; ORDER (1) GRANTING DEFENDANTS' CROSS-
MOTIONS FOR SUMMARY JUDGMENT AND (2) DENYING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT